**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 95-5760

REX EUGENE LOVE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                        No. 95-5825

JERRY WAYNE SHEPPARD,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
James C. Fox, District Judge.
(CR-94-122-F)

Argued: October 27, 1997

Decided: January 20, 1998

Before WILKINSON, Chief Judge, HAMILTON, Circuit Judge,
and MERHIGE, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Hamilton and Senior Judge Merhige joined.

_____

**COUNSEL**

**ARGUED:** Michael Smith Scofield, Charlotte, North Carolina, for Appellant Love; Alice Carson Stubbs, STUBBS, PAHL & PERDUE, P.A., Raleigh, North Carolina, for Appellant Sheppard. Jane H. Jackson, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Anne M. Hayes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Rex Love and Jerry Sheppard were convicted of conspiracy to possess with intent to distribute marijuana and cocaine in violation of 21 U.S.C. § 846. Love also was convicted of possession with intent to distribute cocaine and marijuana in violation of 21 U.S.C. § 841(a)(1). Love and Sheppard appeal their convictions and sentences on several grounds. They argue principally that the district court's method of jury selection violated Fed. R. Crim. P. 24(c) and therefore constituted reversible error. Finding each of the defendants' contentions without merit, we affirm the judgment of the district court.

I.

Love and Sheppard were members of a multimillion dollar marijuana and cocaine ring. The organization imported the drugs from Mexico into Texas or Arizona and then transported them to North Carolina for distribution. In its closing argument, the government estimated that the conspiracy handled over 10,000 pounds of marijuana and at least 200 kilograms of cocaine. Love aided in distributing the drugs in North Carolina, employing others to unload large marijuana shipments at different storehouses within the state. Sheppard served as both a courier and enforcer for the organization. The evidence showed that he helped transport drugs from Arizona to North Carolina and, mainly, that he served as a hit man.

2

One coconspirator, Clyde Smith, testified at trial that Charles Glenn Parker, another coconspirator, hired Sheppard to intimidate and then arrange the assassination of two former associates. Parker feared that the two men, Harry Gautier and Donald Ray Thompson, would testify against him in his own state court trial. Parker first purchased a car for Sheppard so that he could surveil Gautier and Thompson in Goldsboro, North Carolina. Smith recalled that Parker told him that ultimately Sheppard did go to Gautier's residence to kill him, but failed in the effort because the gun would not fire. Gautier confirmed that an attempt was made on his life. When asked why Parker chose Sheppard to serve in this capacity, Smith testified, over the defense's objection, that Parker had told him "that Jerry Sheppard had a prior record for murder, that he had killed a rat and went to prison for it."

While in jail awaiting trial, Sheppard became friends with a federal prisoner, Raeford Carr. Carr testified at trial that Sheppard spoke to him on various occasions concerning his participation in the activities of the conspiracy. According to Carr, Sheppard told him that he drove to Arizona to transport marijuana, that he traveled to Arkansas to find a lawyer for one of the organization's couriers, and that he participated in an attempted hit on a witness. Carr testified that he contacted federal agents himself after having the above jailhouse conversations with Sheppard.

The government originally filed an indictment in September 1994 against eleven members of the conspiracy, not including Love or Sheppard. In January 1995, the government filed a superseding indictment against twenty persons, including the eleven originally named defendants and Love and Sheppard. Of the first eleven codefendants, only two pled not guilty. Both were tried before a jury in a trial beginning February 27, 1995, and both were convicted. Love and Sheppard were tried in June 1995 in a separate trial with four other codefendants, two of whom were fugitives at the time of trial. The jury found Love and Sheppard guilty on the conspiracy charge, and found Love guilty of possession with intent to distribute both marijuana and cocaine. The jury further found a sum of $300,000 subject to criminal forfeiture by Love, but not Sheppard. The court sentenced Love to 360 months in prison plus five years supervised release, and Sheppard to 210 months plus five years supervised release.

II.

A.

The defendants' main contention is that the district court's failure
to follow Fed. R. Crim. P. 24(c) in selecting a jury constitutes revers-
ible error. Accordingly, some discussion of the background of this
trial and of the jury selection procedure used by the district court is
appropriate.

In a pretrial order, the district court found several extenuating fac-
tors requiring modification of traditional trial procedures. The district
court first noted that in the prior February 1995 trial, the organization
had been shown to be one with substantial financial resources and
members "who would not hesitate to use money or violence to com-
promise witness integrity." The court specifically referred to testi-
mony at the earlier trial that one of the codefendants there had
intimidated a potential witness in a related state matter. The court also
cited allegations concerning the murder of a witness in a related mat-
ter in another state, the attempted murder of a witness in a related
North Carolina matter, and threats made against codefendants and
their families, including the detonation of a pipe bomb at the home
of a codefendant who testified for the government at the February
trial. Finally, the court observed that two of the codefendants in the
present case remained fugitives, one of whom was classified as
"armed and dangerous." The district court therefore concluded: "The
circumstances surrounding the trial, as evidenced above, have given
rise to a serious potential threat to the integrity of the judicial process
and to the safety of witnesses, jurors, court personnel and spectators."

Accordingly, the district court established trial parameters designed
to respond to the potential security threats. The court specifically
chose to employ a special jury selection procedure. The court impa-
nelled an eighteen-person jury to hear the evidence in the case. At the
close of evidence and prior to the start of deliberations, each side
would eliminate three jurors by random draw, thereby leaving a regu-
lar jury of twelve to deliberate. Because of the unique procedure, the
court assembled a larger-than-normal venire panel and allowed each
side more peremptory challenges than legally mandated. The govern-
ment received twelve challenges, twice as many as required, and each

4

defendant received four challenges for a total of twenty-four, fourteen more than required.

Although acknowledging that its chosen procedure deviated from Rule 24(c), the district court reasoned that the special circumstances of this trial made the departure appropriate and conferred certain benefits. First, because of the anticipated length of the trial, waiting to designate alternates until the close of evidence would ensure that every juror would be more attentive throughout the trial. Second, the judge explained that the selection method minimized the threat of jury intimidation by requiring an interested party to target a greater number of jurors in order to affect just one who would ultimately deliberate. The district court also noted that the same procedure had been utilized without objection in the prior February trial. The defendants objected, however, to the chosen procedure before the instant trial.

B.

Defendants contend that the district court's failure to follow Fed. R. Crim. P. 24(c) requires reversal. More specifically, the defendants claim that the jury selection procedure employed here precluded the effective use of their peremptory challenges. Because it was impossible to know whether a juror would ultimately deliberate, defendants argue that the procedure forced them to waste their challenges.

Rule 24(c) provides, in part:

> The court may direct that not more than 6 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties.

The district court's jury selection procedure varied from Rule 24(c) in at least two respects. First, the rule authorizes the calling of additional jurors only "in addition to the regular jury" and designated "as alternate jurors." Here, the district court impanelled eighteen jurors, none of whom were designated as regulars or alternates until just

5

prior to deliberations. Second, the rule requires that alternate jurors replace regular jurors "in the order in which they are called." Therefore, the last six persons placed on the jury of eighteen should have been discharged prior to deliberations as unnecessary alternates, rather than six determined by lot.

We cannot endorse or encourage the use of procedures that violate the Federal Rules. Rule 24(c) "represents a national consensus of bench and bar and ought not to be disturbed." United States v. Viserto, 596 F.2d 531, 540 (2d Cir. 1979). Therefore, we join our sister circuits in "encouraging strict adherence" to Rule 24(c). United States v. Sivils, 960 F.2d 587, 594 (6th Cir. 1992); see also United States v. Aguon, 851 F.2d 1158, 1171 (9th Cir. 1988) (en banc), overruled on other grounds by Evans v. United States, 504 U.S. 255 (1992); Viserto, 596 F.2d at 540. However, like those courts, we recognize that under Rule 52(a) we must disregard errors which do not "affect substantial rights." Fed. R. Crim. P. 52(a); see Sivils, 960 F.2d at 593-94; Aguon, 851 F.2d at 1171. "Not every violation of Rule 24 calls for reversal. Reversal is in order only where the irregularity affects substantial rights." United States v. Levesque, 681 F.2d 75, 80 (1st Cir. 1982) (citing Fed. R. Crim. P. 52). To determine whether a deviation from Rule 24(c) affects substantial rights, we must ask whether Love and Sheppard actually were prejudiced by the jury selection procedure utilized here. United States v. Quiroz-Cortez, 960 F.2d 418, 420-21 (5th Cir. 1992); Sivils, 960 F.2d at 593; Aguon, 851 F.2d at 1171; United States v. Reed, 790 F.2d 208, 210 (2d Cir. 1986); United States v. Josefik, 753 F.2d 585, 587 (7th Cir. 1985); United States v. Balk, 706 F.2d 1056, 1059 (9th Cir. 1983); United States v. Phillips, 664 F.2d 971, 993-96 (5th Cir. Unit B Dec. 1981). Because we discern no prejudice to Love or Sheppard from the district court's jury selection procedures, we find the Rule 24(c) violation does not necessitate a new trial.[1]

Initially, we believe that the procedural precautions taken by the district court prevented any prejudice that might have resulted from

_____

[1] We note that this violation of Rule 24(c) does not involve an alternate's presence during jury deliberations which breached the secrecy and privacy of the deliberative process. Cf. United States v. Virginia Erection Corp., 335 F.2d 868, 869-72 (4th Cir. 1964).

the use of the eighteen-juror panel. Although the defendants jointly were entitled to only ten peremptory challenges under Fed. R. Crim. P. 24(b), the court instead gave them a total of twenty-four challenges. From a practical standpoint, this ample number allowed the defendants to remove the jurors perceived to be most objectionable and thereby leave a panel of eighteen acceptable jurors in the box. In United States v. Broadus, 7 F.3d 460, 462 (6th Cir. 1993), the district court seated fourteen jurors to hear the case and just prior to deliberations "drew two who then became alternates." The Sixth Circuit affirmed, despite the fact that the district court did not give the defendant any additional peremptory challenges. Id. at 462-63. In contrast, in the present case, the district court gave the defendants over twice the number of challenges to which they were legally entitled. We conclude that the extra peremptories bestowed by the district court here adequately cured any potential error.

Furthermore, this was not a case where defendants were forced by the jury selection procedure to strike blindly, without knowing whether persons had even a remote possibility of hearing the evidence or deliberating. The defendants knew that every juror against whom they did not exercise a peremptory challenge, and thereby left in the box, would hear the trial evidence and more likely than not would deliberate. Every peremptory challenge utilized by the defense actually prevented the person challenged from hearing the evidence at trial and from deliberating thereafter. Thus, it cannot be said that defendants "wasted" their peremptory challenges. It is difficult to discern any scenario in which the defendants could have been prejudiced. See, e.g., United States v. Olano , 62 F.3d 1180, 1190 n.3 (9th Cir. 1995), cert. denied, 117 S. Ct. 303 (1996).[2]

_____

[2] Love and Sheppard also argue that, under United States v. Ricks, 802 F.2d 731 (4th Cir. 1986) (en banc), their right to exercise peremptory challenges was substantially impaired and that Ricks therefore requires reversal per se. The jury selection procedure employed in Ricks, however, was decidedly different from that employed by the district court here. In Ricks, the district court selected the jury from among fifty-seven venirepersons left after challenges for cause, allocated twelve peremptory challenges to the defendants and six to the government to be used against regular jurors, and employed a "struck jury" selection method. The district court did not inform counsel which portion of the exces-

The district court's evenhanded treatment of the government and the defendants also persuades us that Love and Sheppard were not prejudiced by the Rule 24(c) violation. To be prejudicial, the error must have affected the outcome of the trial proceedings. United States v. Ince, 21 F.3d 576, 582-83 (4th Cir. 1994). Accordingly, the procedures must have harmed the defendants in a way that would have been avoided had the court followed Rule 24(c)'s strictures. But here, the government was not accorded any advantage with respect to the jury selection method: it received an additional six peremptory challenges to the defendants' additional fourteen. Because the government had no greater power to shape the eventual jury than did the defendants, we find no prejudice. See Balk, 706 F.2d at 1059 (permitting government additional challenge held not prejudicial because defendants received three extra peremptories).

Finally, we note that our conclusion conforms with that reached by other circuits considering similar Rule 24(c) violations. In United States v. Sivils, the district court impanelled fourteen jurors to hear the entire case, designating two alternates only at the conclusion of the trial and prior to deliberations. 960 F.2d at 593. As in the present case, the district court in Sivils selected the alternates to be discharged at the close of evidence by random draw. Because the potential prejudice was, as here, of an entirely speculative nature, the court found the error to be harmless. Id. at 594. Other circuits reviewing similar

_____

sively long list would be used to select the final jury, thereby causing defendants to exercise strikes against jurors who never would have sat or deliberated. It was the combination of these factors that led the court to conclude that defendant's right to peremptory challenges had been impermissibly diluted.

These factors simply are not present here. The district judge explained the jury selection procedure in accurate terms, in advance of trial. The district court also utilized the "jury box" method. As the court explained in Ricks, "When the `jury box' method of selection is used, a party knows that each time he strikes a venireman sitting in the box, he is assured of removing someone from the panel who otherwise would serve as a juror." Id. at 733. Unlike in Ricks, every strike here removed someone who would otherwise hear the evidence and more likely than not deliberate.

8

procedures adopted by trial courts also have found the violations therein to be harmless error. See United States v. Olano, 62 F.3d at 1190 n.3 (waiting to designate alternates until just prior to deliberations is harmless error); Broadus, 7 F.3d at 462-63 (waiting to designate alternates until just prior to deliberations not plain error even when judge allocated no extra peremptories); Aguon, 851 F.2d at 1171 (waiting to designate and discharge alternates until just prior to deliberations is harmless error); Levesque, 681 F.2d at 80-81 (assigning alternate to become regular juror out of order does not require reversal). We too find any prejudice in the present case to be at best speculative and in all events neutralized by the district court's evenhanded allocation of extra peremptory challenges to both sides.

III.

Sheppard argues that the district court erred by allowing Clyde Smith to testify that Charles Glenn Parker told him "that Jerry Sheppard had a prior record for murder, that he had killed a rat and went to prison for it." Sheppard contends that the district court should have excluded Smith's testimony because its probative value was "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. He claims that this is especially true because he had never been convicted of murder.

We disagree. Rule 403 judgments are preeminently the province of the trial courts. We thus review a district court's admission of evidence over a Rule 403 objection under a "broadly deferential standard." United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990). "We will not upset such a decision except under the most extraordinary of circumstances, where [a trial court's] discretion has been plainly abused." Id. (internal quotation marks omitted). Furthermore, when reviewing such trial court decisions, we must examine the evidence in the "`light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect.'" Id. (citation omitted).

Smith's testimony was clearly probative of Sheppard's cooperation in the conspiracy. Questions of central importance at trial were whether and how Sheppard became a member of the organization. As part of its case, the government sought to prove that Parker solicited

9

the assistance of Sheppard as an enforcer. To make a compelling case, the government naturally needed to explain why Parker would hire Sheppard to serve in such a capacity. Smith's recollection of Parker's own account of the exact reasons he hired Sheppard as a hit man enabled the jury to understand Parker's motivation. Keeping in mind the deferential standard under which we review the district court, we do not find that the danger of unfair prejudice to Sheppard substantially outweighed the statement's obvious probative value.

Even if Smith's testimony had the potential to prejudice Sheppard, the district court's cautionary instruction rendered the error harmless. Immediately after Smith testified about Parker's statement, the district court instructed the jury, in part: "Now, members of the jury, there's no evidence in the case one way or the other whether or not the conduct commented upon by Parker was true or not true. It's offered as an explanation of why he took certain action." The Federal Rules of Evidence specifically instruct judges to consider the effectiveness of a limiting instruction when deciding whether to exclude evidence on grounds of unfair prejudice. Fed. R. Evid. 403 advisory committee's note. Here the district court prudently cautioned the jury that no evidence showed that Sheppard in fact had committed a prior murder. We generally presume that a jury will follow cautionary instructions regarding potentially prejudicial evidence. United States v. Johnson, 114 F.3d 435, 444 (4th Cir.), cert. denied, 118 S. Ct. 257 (1997).

Sheppard also asserts that Smith's testimony was inadmissible "other crimes" evidence under Fed. R. Evid. 404(b). Of course, Rule 404(b) only makes such evidence inadmissible "to prove the character of a person in order to show action in conformity therewith." Our holding that Smith's testimony was probative of Parker's reasons for inviting Sheppard within the folds of the conspiracy, therefore, forecloses Sheppard's argument under Rule 404(b). The testimony was not admitted to prove action in conformity with Sheppard's prior criminal character. Smith's testimony was necessary to inform the jury of the context of Sheppard's participation in the conspiracy and, thus, to complete the story presented by the government at trial. We have not considered evidence admitted for this purpose to be other crimes evidence precluded by Rule 404(b). United States v. Kennedy, 32 F.3d 876, 885-86 (4th Cir. 1994). We hold, in sum, that the district court did not err by permitting Smith's testimony.

10

IV.

Sheppard next argues that the district court erred by permitting Raeford Carr to testify about statements Sheppard made to him while the two were incarcerated together. He claims that the government intentionally placed Carr in the same cell block to induce Sheppard to make an incriminating statement concerning the conspiracy charge for which he had already been indicted. Relying on Massiah v. United States, 377 U.S. 201 (1964), Sheppard maintains that the admission at trial of his post-indictment jailhouse confessions violated his Sixth Amendment right to counsel.

We disagree. A criminal defendant's Sixth Amendment right to counsel is violated when incriminating statements "deliberately elicited" by the government, made after indictment and outside the presence of counsel, are admitted against the defendant at trial. Massiah, 377 U.S. at 206; see also United States v. Henry , 447 U.S. 264, 270 (1980). The role of the government in the deliberate elicitation of such statements is of crucial importance, for "the Sixth Amendment is not violated whenever -- by luck or happenstance -- the State obtains incriminating statements from the accused after the right to counsel has attached." Maine v. Moulton, 474 U.S. 159, 176 (1985); see also Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

Because no evidence shows that Carr acted on behalf of the government when listening to Sheppard's jailhouse confessions, the Sixth Amendment claim is meritless. Although Carr had previously cooperated with the government in a separate case, no evidence showed that such cooperation extended in any manner to the investigation of Sheppard. Nor did any evidence support Sheppard's allegation that the government intentionally placed Carr in his cell block. When Carr spoke with Sheppard in jail, he had not received any instructions from the government. Carr also was not paid for providing information concerning Sheppard. We have rejected past defendants' Sixth Amendment claims when these crucial indicia of government cooperation are lacking. Harker v. Maryland, 800 F.2d 437, 445 (4th Cir. 1986).

The initiative here was that of Carr. The record indicates that Carr contacted federal agents himself after Sheppard made the relevant

11

incriminating statements. The behavior of an informant who initiates contact with an indicted defendant -- whether because of conscience, curiosity, or even potentially to curry an unpromised future favor from the government -- cannot be attributed to the government. Thomas v. Cox, 708 F.2d 132, 136 (4th Cir. 1983). Accordingly, Sheppard's Sixth Amendment claim is rejected.

V.

Love and Sheppard next object to the absence of the district judge during portions of the trial's closing arguments. Prior to both sides' arguments, the judge told the jury that he would on occasion be in his chambers, working on other matters, but at all times would be available to rule on objections that might be presented by the attorneys. The record on appeal discloses no objections by either side. Relying on Riley v. Deeds, 56 F.3d 1117 (9th Cir. 1995), defendants contend that the judge's absence constitutes structural error and is therefore reversible per se.

While we do not condone the absence of the trial judge from any phase of the trial proceeding, we reject defendants' attempt to characterize the district judge's absence here as structural error. The Riley court did not hold that the absence of the judge alone would constitute structural error. Id. at 1120. The court instead rested its holding on the fact that the trial judge there was not only physically absent from the courtroom; he did not even make the decision to permit relevant testimony to be read back to the jury or delineate which portions thereof should be presented to it. Id. All of the above functions were instead carried out by the judge's law clerk, as the judge could not be located. "Suffice it to say that in this case there was a complete abdication of judicial control over the process." Id. at 1121. Those circumstances were not present in defendants' trial. While absent from the courtroom during portions of the closing argument, the district judge was in his chambers and available to exercise his discretion with respect to objections made by either side.

Because defendants failed to object below, we must determine whether the district judge's absence here was plain error that resulted in prejudice to Love or Sheppard. Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993); United States v. Grant, 52

12

F.3d 448, 449 (2d Cir. 1995). Any error here was harmless. Defendants have not pointed to any specific comments made in the district judge's absence that affected the trial's fairness. See Heflin v. United States, 125 F.2d 700, 701 (5th Cir. 1942). Love and Sheppard allege only that the absence of the judge might give the jury the impression that the judge had already made up his own mind. A showing of prejudice cannot be based on such speculation. It appears that the judge left the courtroom during both sides' closing arguments, making it impossible for the jury to discern which side the judge prematurely favored. Finally, the judge explained to the jury why he would leave the courtroom -- to work on jury instructions or conduct other business. This explanation should have dispelled any potential perception by jurors that the judge left because he had already been persuaded by the government's case. Because defendants have failed to demonstrate prejudice, the judgments of conviction must be sustained.

VI.

Defendants next contend that the district court erred in determining their sentences under the Guidelines.

A.

Love and Sheppard both argue that the district court incorrectly determined their base offense levels by holding them responsible for drug amounts inconsistent with the jury's criminal forfeiture verdicts. Love received a base offense level of 36 based on his responsibility for a marijuana equivalency of 11,125.529 kilograms, and Sheppard received a base offense level of 28 based on responsibility for 544.32 kilograms of marijuana. See U.S.S.G. § 2D1.1(c). Defendants, however, working backwards from the jury's criminal forfeiture verdicts of $300,000 for Love and $0 for Sheppard, calculate approximate drug amounts the jury must have believed each was responsible for within the conspiracy. The defendants contend that the district court was legally precluded from basing its section 2D1.1(c) determination on any amount beyond that implicitly reflected in the forfeiture judgments.

We disagree. The district court has a separate obligation, which it carried out here, to make independent factual findings regarding rele-

13

vant conduct for sentencing purposes. See U.S.S.G. § 1B1.3. In United States v. Watts, 117 S. Ct. 633 (1997) (per curiam), the Supreme Court reaffirmed that district judges should have "`the fullest information possible concerning the defendant's life and characteristics'" when selecting an appropriate sentence. Id. at 635 (quoting Williams v. New York, 337 U.S. 241, 247 (1949)). The Court based its decision, in part, on 18 U.S.C. § 3661, which states: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

The defendants' attempt to impose the forfeiture verdicts as artificial limitations on the district judge's sentencing discretion turns 18 U.S.C. § 3661 on its head. When presented with the criminal forfeiture count, the jury simply was not asked to make independent findings of the specific drug amounts for which each defendant should be held responsible. The different routes by which the jury could have reached its verdicts are almost limitless. Even Love's attorney admitted the impossibility of interpreting the jury verdicts when he stated during the sentencing hearing: "It's true that there's no way of telling exactly how much drugs they held him [Love] responsible for." Here, the district court appropriately fulfilled its obligation by considering the full range of information presented in the defendants' presentence reports, the objections thereto, and argument presented during individual sentencing hearings.

As an appellate court, our role is only to review the district court's factual findings for clear error. United States v. Nelson, 6 F.3d 1049, 1055 (4th Cir. 1993). We do not attempt to harmonize a district court's factual findings during sentencing with the accompanying jury verdict. The Supreme Court has offered guidance to appellate courts in this respect. First, the Court has indicated that jury verdicts need not be squared with the relevant conduct considered by judges during sentencing. In Watts, the Court held that even acquitted conduct may be considered in the determination of the proper offense level. 117 S. Ct. at 638. Second, in United States v. Powell , 469 U.S. 57, 68-69 (1984), the Court held that jury verdicts are not reviewable for internal inconsistency. In that decision, the Court noted that a criminal defendant is already protected from such inconsistency "by the inde-

14

pendent review of the sufficiency of the evidence undertaken by the trial and appellate courts." Id. at 67. Similarly, here defendants are protected against any seeming inconsistency between the relevant conduct considered for sentencing purposes and the jury verdicts by our review of the district judge's independent factual findings.

Applying the proper standard of review, we find no clear error in the district court's findings on the drug amounts for which each defendant was responsible. Each presentence report carefully outlined the bases for its conclusions, citing specific instances of drug activity and the weights of drugs involved on each occasion. Only Love objected to his presentence report's determination of the drug amount and neither defendant presented evidence contradicting the reports' conclusions. "A mere objection to the finding in the presentence report is not sufficient. . . . Without an affirmative showing the information is inaccurate, the court is `free to adopt the findings of the [presentence report] without more specific inquiry or explanation.'" United States v. Terry, 916 F.2d 157, 162 (4th Cir. 1990) (citation omitted). In light of the impossibility of distilling conclusions on drug amounts from the jury's forfeiture verdicts, and because of the substantial evidence presented as to drug amounts in the presentence reports, we hold that the district court's determinations of the defendants' base offense levels must be sustained.

B.

1.

Sheppard raises several additional challenges to his sentence on appeal. First, he argues that the district court erred by refusing to decrease his offense level by two to four levels for his role as a minor or minimal participant. He specifically contends that the jury's failure to find him subject to criminal forfeiture proves he is less culpable than his codefendants.

Sheppard's argument is meritless. We review a district court's determination of a defendant's role in an offense for clear error. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir. 1989). A minimal participant, who is accorded a four level reduction, is one who is "plainly among the least culpable of those involved in the con-

15

duct of a group." U.S.S.G. § 3B1.2 Application Note 1. An example of a minimal participant in a drug operation would be "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment." Id. § 3B1.2 Application Note 2. It is preposterous to claim that Sheppard-- who not only transported drugs from Arizona to North Carolina, but who most importantly surveilled and arranged the assassination of potential adverse witnesses -- is analogous to a person who once helps unload part of a drug shipment. The Guidelines further define a minor participant, who is accorded a two level reduction, as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." Id. § 3B1.2 Application Note 3. The Introductory Commentary to section 3B1.1 states that the determination of a defendant's role must be made on the basis of all relevant conduct. Thus, whether or not the jury found Sheppard subject to criminal forfeiture is irrelevant to this determination. Again, on the basis of the relevant conduct, we do not agree that a defendant hired to commit murder -- more specifically, the murder of potential witnesses against the conspiracy -- is "less culpable than most other participants." We therefore find no error in the district court's refusal to decrease Sheppard's offense level.

2.

Sheppard next contends that the district court erred by increasing his offense level two levels pursuant to section 2D1.1(b)(1) for possession of a firearm, and two further levels pursuant to section 3C1.1 for obstruction of justice. He argues that both findings were supported only by unreliable hearsay -- the statements of his coconspirators. Because Sheppard's argument raises only a factual question, we again review for clear error. United States v. Puckett , 61 F.3d 1092, 1095 (4th Cir. 1995); Daughtrey, 874 F.2d at 218.

Preliminarily, there is no bar to the use of hearsay in sentencing. "United States courts have a long history of using reliable hearsay for sentencing. `[T]he trial court may properly consider uncorroborated hearsay evidence that the defendant has had an opportunity to rebut or explain.'" Terry, 916 F.2d at 160-61 (citation omitted). Furthermore, the statements of his coconspirators were admitted properly as non-hearsay under Fed. R. Evid. 801(d)(2)(E) because they constitute statements "by a coconspirator of a party during the course and in fur-

16

therance of the conspiracy." This evidence therefore is deemed reliable under the Federal Rules, so we reject Sheppard's after-the-fact challenge to its use in his sentencing. Finally, Sheppard's own confessions to Carr confirm his coconspirators' statements. Carr testified that Sheppard told him that he went with an associate to kill Gautier at his house, but that the automatic rifle in their possession jammed. In light of the substantial trial evidence and Sheppard's failure to make any showing that he did not possess a gun or obstruct justice in a variety of ways, see Terry, 916 F.2d at 162, we affirm the district court's increase of two levels for each factor.

3.

Sheppard last raises several objections to the determination of his criminal history. He first argues that the district court erred by adding one criminal history point for a worthless check charge, identified in the presentence report, that he claims was dismissed. See U.S.S.G. § 4A1.1(c). Sheppard, however, failed to produce any evidence that this charge was dismissed other than to argue that no sentence of imprisonment or probation is recorded with respect to the charge. Because the defendant failed to make any showing of the alleged dismissal of this charge, the district court was correct to rely on the presentence report. Terry, 916 F.2d at 162.

Sheppard next asserts that the district court erred in calculating his criminal history in other respects under section 4A1.1. The presentence report shows that Sheppard was convicted on June 16, 1972, for five robberies committed on separate occasions. Because these offenses were consolidated for sentencing, they were considered related under section 4A1.2(a)(2). See U.S.S.G. § 4A1.2 Application Note 3. Pursuant to section 4A1.1(a), the court therefore first added three points for the consolidated sentences for the five robberies. The court then added one criminal history point for each of three of the five robberies pursuant to section 4A1.1(f). That section instructs courts to add a criminal history point, up to three points, for each prior sentence resulting from a crime of violence that does not receive a point under section 4A1.1(a) because the sentences are considered related.

Sheppard first contends that the district court erred by adding the three criminal history points for the consolidated sentences. He claims that the robbery conviction on which the three points were based actu-

17

ally expired in 1977 and that the remaining time he served in prison was based on the other convictions. Sheppard's argument is meritless, both factually and legally. First, the presentence report indicates that the sentence on the specific conviction charge was for ten years, which would cause it to expire in 1982, not 1977. Under section 4A1.2(e)(1), Sheppard's incarceration as late as 1982 would be "within fifteen years of the defendant's commencement of the instant offense" and therefore would be counted. Second, as explained before, Sheppard's five June 16, 1972 convictions are considered related pursuant to section 4A1.2(a)(2). That section specifically instructs the district court to "[u]se the longest sentence of imprisonment if concurrent sentences were imposed and the aggregate sentence of imprisonment imposed in the case of consecutive sentences." Because Sheppard was not paroled until June 9, 1989 on the related convictions, he was incarcerated within fifteen years of the commencement of his instant conspiracy offense, and therefore the sentence is counted in his criminal history calculation. The district court's determination was therefore legally correct.

Sheppard next asserts that the district court erred by adding one criminal history point each, pursuant to section 4A1.1(f), for three of the June 16, 1972 robbery convictions because they were related. Sheppard misunderstands the relevant guideline. Section 4A1.1(f) instructs the court to add the criminal history points, in part, <u>because</u> the sentences are considered related. The only exception to this rule applies if the sentences are considered related"<u>because the offenses occurred on the same occasion</u>." <u>Id.</u>§ 4A1.1(f) (emphasis added). Although Sheppard's sentences with respect to his five robberies were considered related, they were not deemed related under the Guidelines <u>because</u> they occurred on the same occasion. In fact, the presentence report clearly indicates that each robbery occurred on a separate date. Therefore, the court's addition of one point each for three of the robberies consolidated for sentencing was legally correct.

VII.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

18