UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 98-4101

KEVIN TINSLEY,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 98-4118

GREGORY MCCORKLE,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                         No. 98-4119

SERGIO BARRIOS,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-97-249-A, CR-97-328-A)

Submitted: October 30, 1998

Decided: November 18, 1998

Before HAMILTON and WILLIAMS, Circuit Judges, and
HALL, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

Jerome Patrick Aquino, Alexandria, Virginia; Gregory Edward Stambaugh, Manassas, Virginia; Edward Blair Brown, Alexandria, Virginia, for Appellants. Helen F. Fahey, United States Attorney, James L. Trump, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

In these consolidated cases, Kevin Tinsley, Gregory McCorkle, and Sergio Barrios appeal their criminal convictions and sentences. Having thoroughly reviewed each of their claims, we affirm for the reasons stated below.

I

Gregory McCorkle and Luis Figueroa began selling cocaine together in 1994, upon McCorkle's suggestion that they pool their money and buy a larger amount of cocaine than they had been able to deal separately. The two men cut and packaged the drugs in their apartments, which were in the same building in Washington, D.C. Their business increased to the point that, by the summer of 1995, they were buying kilos of cocaine from New York. McCorkle made most of the trips to New York. McCorkle sold eighty percent of the cocaine, and Figueroa sold twenty percent.

2

The clientele for this business consisted mostly of homosexual men whom Figueroa and McCorkle met at bars and nightclubs in the Washington, D.C., area. Most of the customers bought cocaine for individual use, in quantities ranging from one-half gram to one-eighth ounce. McCorkle delivered to customers at or near their homes, often in Northern Virginia, or met customers at his apartment.

In 1994, McCorkle met Sergio Barrios. Barrios was soon involved in the drug business. McCorkle, Figueroa and Barrios distributed both powder and crack cocaine. They had several other individuals selling cocaine for them. With the profits from the drug business, McCorkle, Barrios and Figueroa bought new cars and real estate, including McCorkle's condominium in Hawaii. McCorkle had several bank and brokerage accounts. Upon their subsequent arrest, Barrios had over $115,000 in cash seized from his apartment, and McCorkle had almost $40,000 seized in Hawaii.

Figueroa had a friend named Kevin Lewis who ran a cleaning business. McCorkle devised a plan whereby McCorkle and Figueroa would appear to work for Lewis, and could receive life and health insurance through the business. McCorkle laundered drug proceeds through the company. Barrios later became part of this scheme.

In August 1996, McCorkle and Figueroa sold the drug business to Barrios for $100,000. Even after this transaction, McCorkle helped Barrios cut, package and distribute drugs when he was in the area.

In December 1995, McCorkle was stopped for speeding by Maryland State Trooper David Hughes. During the stop, Hughes seized a kilogram of cocaine from the car, and arrested McCorkle. McCorkle was charged with possession with intent to distribute cocaine, and released on bond. By the new year, McCorkle began planning to have Trooper Hughes killed. McCorkle located a house in Abingdon, Maryland, that he thought belonged to Trooper Hughes, though in fact it belonged to Trooper Hughes's brother, Michael, who is also a state trooper, and their parents. McCorkle made at least two reconnaissance trips with his friend and customer, Norfleet Person, to Abingdon, Maryland. Person traded McCorkle a Glock 9 mm pistol for drugs and money. Person also discussed the plan to shoot the trooper with Bar-

3

rios, and made three trips to Abingdon with Barrios to view the trooper's house.

McCorkle asked Bruce Woody to find someone to kill Hughes. He promised a $5000 finder's fee, with the killer to receive $10,000. Woody introduced McCorkle to Vernon Bryant, and the latter recruited William Potts. McCorkle took the pair to Abingdon three or four times, and discussed possible methods of murder, including using a bomb. McCorkle bought a car for Bryant and provided the pair with an assault rifle and two pistols. Bryant bailed out of the scheme, so Woody and Potts attempted to kill Hughes. Potts broke into the home, armed with a 9 mm pistol he obtained from McCorkle. The attempt failed. Within the week, McCorkle returned twice more to Abingdon with the hired killers, but they did not see Trooper Hughes.

McCorkle, having been introduced to Kevin Tinsley by Woody, hired Tinsley to kill Hughes. McCorkle drove Tinsley and Jose Fermaintt to Abingdon to discuss their plans. Tinsley and Fermaintt made several other trips to the area. McCorkle gave Fermaintt three guns and some walkie talkies to use. On August 27, Michael Hughes was driving down the road on which he lived, when a man came out of the trees and began firing at him. Several shots were fired, and Hughes was struck in the left arm, shattering the bone.

McCorkle told Figueroa "they" did the shooting, and that he paid $10,000. McCorkle later stated that the wrong man was shot, and he intended to try again to kill David Hughes.

Barrios was arrested as a result of a sting cocaine purchase by an undercover officer in April 1997. McCorkle returned from Hawaii and went through Barrios's apartment to dispose of any incriminating evidence. He took what had been sold to McCorkle as a remote-controlled bomb and disposed of it in a public trash can.

Tinsley was convicted of conspiracy to travel in interstate commerce with intent that a murder be committed as consideration for promise to pay, in violation of 18 U.S.C.A. § 1958 (West Supp. 1998), and two counts of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c)

4

(West Supp. 1998), 18 U.S.C. § 2 (1994). He was sentenced to forty-five years imprisonment. McCorkle was convicted of continuing criminal enterprise, in violation of 21 U.S.C.A.§ 848(a), (c) (West Supp. 1998); conspiracy to travel in interstate commerce with intent that a murder be committed, in violation of 18 U.S.C. § 1958; three counts of using and carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. §§ 924(c), 2; money laundering, in violation of 18 U.S.C.A. § 1956(a)(3)(A), (B) (West Supp. 1998); and attempting to kill a Maryland State Police Officer with intent to prevent his testimony, in violation of 18 U.S.C.A.§ 1956(a)(1)(A) (West Supp. 1998). He was sentenced to life plus forty-five years imprisonment. Barrios was convicted of continuing criminal enterprise, in violation of 21 U.S.C. § 848(a), (c); conspiracy to travel in interstate commerce with intent that a murder be committed, in violation of 18 U.S.C. § 1958; two counts of using and carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. §§ 924(c), 2; six counts of distribution of cocaine, in violation of 21 U.S.C. § 841(a)(1) (1994); and money laundering, in violation of 18 U.S.C.A. § 1956(a)(3)(A), (B). He was sentenced to life plus twenty-five years imprisonment.

II

In No. 98-4101, Tinsley raises five issues on appeal. First, he claims that the evidence was insufficient to support his conviction for using or carrying a .357 caliber revolver in the conspiracy to kill David Hughes. Tinsley claims that the jury confused testimony concerning the .357 revolver and a .357 rifle, both of which were involved in the case.

On direct appeal, the sufficiency of the evidence is viewed in the light most favorable to the Government to determine whether a rational jury could have found each element of the offense beyond a reasonable doubt. United States v. Phan, 121 F.3d 149, 152 (4th Cir. 1997), cert. denied, ___ U.S. #6D6D 6D#, 66 U.S.L.W. 3388 (U.S. Feb. 23, 1998) (No. 97-863). Here, there was evidence that McCorkle gave Fermaintt a .357 pistol, a .357 rifle, and a .45 handgun. Fermaintt discussed with McCorkle and Tinsley how those guns would be used to kill Trooper Hughes. Fermaintt gave Morales the same three guns in a black bag, and asked Morales to give them to Tinsley to be given

5

back to McCorkle. Morales took the .45 out of the bag but gave the rest of the contents to Tinsley, and later gave the .45 to Tinsley as well. Thus, there is sufficient evidence that Tinsley received from Morales and carried the .357 handgun in connection with the conspiracy to murder David Hughes. The fact that Tinsley can construct another scenario, or challenge the evidence supporting this one, is irrelevant on appeal.

Next, Tinsley argues that the district court should have granted him a new trial on the basis of after-discovered evidence. McCorkle testified at trial that Fermaintt and Morales were involved in an unrelated killing. According to Tinsley, the Government portrayed McCorkle as a liar on this point during cross-examination. Tinsley claims that the Government now believes McCorkle was right about the murder, citing to the Government's response to a post-trial motion to vacate. Tinsley argues that Morales breached his plea agreement by failing to disclose his involvement in this murder. He also asserts that the integrity of the judicial process has been impaired because McCorkle was portrayed as a liar when he was testifying truthfully, and because Fermaintt misled the jury. If the jury had been aware of these circumstances, according to Tinsley, it might have acquitted Tinsley of all charges.

In this Circuit, motions for new trial based on after-discovered evidence, Fed. R. Crim. P. 33, must satisfy a five-part test: (1) the evidence is newly discovered; (2) facts are alleged from which the court can infer due diligence on the movant's part; (3) the evidence is not just cumulative or impeaching; (4) the evidence is material; and (5) the evidence would likely result in acquittal if a new trial were granted. United States v. Christy, 3 F.3d 765, 768 (4th cir. 1993). We have never granted a new trial unless all five parts of the test were established. United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995). Here, the district court denied Tinsley's motion for a new trial based on after-discovered evidence on the grounds that the evidence in question was impeachment evidence, and would not likely have led to a new trial. This Court reviews the district court's decision for abuse of discretion. United States v. Arrington , 757 F.2d 1484, 1486 (4th Cir. 1985).

The evidence that Fermaintt was not truthful about his part in a murder in Washington, D.C., does not bear directly on his testimony

6

concerning the drug business of McCorkle and Barrios or the conspiracy to kill Trooper Hughes. At most, it is impeachment evidence that might affect the jury's view of his credibility. Thus, this claim lacks merit.

Tinsley next asserts that the Government did not present sufficient evidence to sustain his conviction for murder for hire, in violation of 18 U.S.C. § 1958(a). He claims that the Government offered no evidence that he received or was promised anything of pecuniary value to murder Trooper Hughes.

Section 1958(a) provides, in pertinent part:

> Whoever travels in . . . interstate or foreign commerce . . . with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be [fined or imprisoned as provided].

Thus, the elements that must be proved are: (1) travel in interstate commerce; (2) with the intent that a murder be committed; (3) as consideration for the receipt of or promise to pay something of pecuniary value. See United States v. Morin, 80 F.3d 124, 127 n.2 (4th Cir. 1996).

Tinsley argues that there was no evidence at trial that he received anything for his part in the conspiracy to murder Trooper Hughes. He points to McCorkle's testimony that "I didn't pay Tinsley anything at any time," and Woody's testimony that Tinsley denied that he had been paid shortly after the shooting.

Viewing the evidence in the light most favorable to the Government, as we must, there is evidence sufficient to support the conviction. Fermaintt testified that Tinsley came to him with a money-making proposition, saying he knew someone who would pay them $25,000 to perform a murder. Tinsley later introduced McCorkle as that person, and the three of them drove to Maryland to assess the location for the murder. This evidence is sufficient and thus, this claim lacks merit.

7

Tinsley argues that the district court erred in allowing witnesses to testify that he had been recently released from jail. The district court ruled before trial that such references were permissible, because they were needed to connect certain acts and witnesses to Tinsley. The court also ruled, however, that no mention was to be made of the identity of the crime of conviction, and that a cautionary instruction would be given to the jury when the issue was raised. Tinsley asserts that the evidence was inadmissible under Fed. R. Evid. 403, 404 and 609. The district court's limited admission of such references for identification purposes does not constitute an abuse discretion under Fed. R. Evid. 403 or 404(b). See United States v. Love, 134 F.3d 595, 603 (4th Cir.), cert. denied, ___ U.S. ___, 66 U.S.L.W. 3790 (U.S. June 15, 1998) (No. 97-9085); United States v. Queen, 132 F.3d 991, 995 (4th Cir. 1997), cert. denied, #6D6D 6D# U.S. ___, 66 U.S.L.W. 3704 (U.S. Apr. 27, 1998) (No. 97-8487). Tinsley's reliance on Fed. R. Evid. 609 is misplaced, as Tinsley was not a witness and there was no evidence admitted that he had been convicted of a crime. Mere reference to his release from jail does not constitute evidence of a conviction.

Finally, Tinsley challenges the district court's denial of his motion for severance, alleging that his trial with McCorkle and Barrios unfairly prejudiced him because of the extensive testimony about their drug business, lavish lifestyle, and homosexual relationships. The district court denied the motion to sever, holding that Tinsley was involved "squarely in all charges sufficiently that he c[ould] be fairly and appropriately tried in the one case." The Government argues that, because Tinsley was charged as a member of the drug conspiracy and the criminal enterprise, all of the drug-related evidence would have come in even in a separate trial.

The district court's decision not to grant a motion to sever under Fed. R. Crim. P. 14 is reviewed for abuse of discretion. United States v. Roseboro, 87 F.3d 642, 647 (4th Cir. 1996), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3465 (U.S. Jan. 6, 1997) (No. 96-6061). As a general rule, defendants who are indicted together are tried together. United States v. Williams, 10 F.3d 1070, 1079 (4th Cir. 1993). The movant bears the burden of showing that the prejudicial joinder would result in a miscarriage of justice. Id. at 1080. We conclude that the district court did not abuse its discretion in this instance.

8

III

In No. 98-4118, McCorkle asserts seven issues on appeal. First, he argues that the Government did not sustain its burden of proof to support his conviction for engaging in a continuing criminal enterprise (CCE), in violation of 21 U.S.C. § 848.

The Government must prove the following elements to support a CCE conviction: (1) defendant committed a felony violation of the federal drug laws; (2) the violation was one of a series of infractions of the drug laws; (3) the violations were made in concert with five or more people; (4) defendant was an organizer, supervisor, or held some management position as to those people; and (5) defendant received substantial income from the continuing violations. United States v. Wilson, 135 F.3d 291, 303 (4th Cir.), cert. denied, ___ U.S. ___, 66 U.S.L.W. 3758 (U.S. May 26, 1998) (No. 97-8750). We uphold the jury verdict if there is substantial evidence, viewed in the light most favorable to the government, to support it. Id. The management element is given a common sense interpretation, bearing in mind that the statute is intended to reach the leaders of the drug trade. Id.

McCorkle challenges the third and fourth elements of the offense. The Government offered the following facts as support for McCorkle's role as organizer, supervisor, and manager. McCorkle negotiated with Kevin Lewis to set up the money laundering scheme. McCorkle brought Barrios into the drug business, and arranged for him to be part of the money laundering plan. Before Barrios bought the business, McCorkle paid him $1000 to travel to New York to buy cocaine. McCorkle arranged a new drug source for himself, Figueroa and Barrios. Bruce Woody agreed to work for McCorkle selling cocaine on consignment. McCorkle recruited Brian Baldwin to work for Barrios. McCorkle organized the sale of the business from himself and Figueroa to Barrios. Todd Tolson sold cocaine for McCorkle. After McCorkle and Barrios were arrested, McCorkle directed Figueroa and Person in destroying evidence, wiring money, and paying attorneys.

McCorkle also directed the entire conspiracy to kill Hughes, which was intended to cover up the drug conspiracy and was financed with money from the drug conspiracy. That effort involved Bruce Woody, Vernon Bryant, William Potts, Kevin Tinsley, Jose Fermaintt and oth-

ers. McCorkle obtained weapons and walkie talkies, interviewed potential killers, drove them to Maryland, showed them the Hughes house, and described Hughes.

Therefore, it is clear that the evidence was sufficient to prove that McCorkle supervised, managed, and directed five or more people in the continuing criminal enterprise at issue, and his conviction for that offense is affirmed.

McCorkle raises four claims challenging the computation of his sentence. First, he asserts that he is entitled to a two-level reduction for acceptance of responsibility. Under U.S. Sentencing Guidelines Manual § 3E1.1(a) (1995), a defendant who clearly shows acceptance of responsibility for an offense may have his offense level decreased by two levels. We review the district court's factual findings regarding denial of an acceptance of responsibility adjustment under a clearly erroneous standard. United States v. Myers, 66 F.3d 1364, 1372 (4th Cir. 1995). The adjustment is not meant to apply where defendant has put the government to its burden of proof at trial. USSG § 3E1.1, comment. (n.2); United States v. Castner, 50 F.3d 1267, 1279-80 (4th Cir. 1995). An obstruction of justice enhancement normally shows that the defendant has not accepted responsibility for his criminal conduct. USSG § 3E1.1, comment. (n.4); United States v. Murray, 65 F.3d 1161, 1165 (4th Cir. 1995).

McCorkle testified at trial and admitted some, but not all, of the conduct for which he was convicted. However, the Government put on a lengthy trial, much of which concerned McCorkle's efforts to obstruct justice by attempting to have a potential witness against him murdered before trial. Therefore, the district court's finding that McCorkle is not entitled to an adjustment for acceptance of responsibility is not error.

Next, McCorkle asserts that the district court erred at sentencing in finding him responsible for over 1.5 kilograms of crack cocaine. The sentencing court relied on the calculations of the probation officer in the presentence report. We review the district court's factual findings as to the amount of drugs attributable to a defendant for clear error. United States v. Lamarr, 75 F.3d 964, 972 (4th Cir.), cert. denied, ___ U.S. ___, 65 U.S.L.W. 3309 (U.S. Oct. 21, 1996) (No. 95-9398).

10

McCorkle bears the burden of proving that the information in the presentence report relied on by the district court is incorrect; mere objections are inadequate. Love, 134 F.3d at 606.

McCorkle argues that the information in the presentence report is unreliable because it is based in part on hearsay statements from Bruce Woody to investigators about the amounts of crack cocaine Woody bought from McCorkle. In computing drug quantities for sentencing, the district court can consider any reliable evidence, including hearsay. United States v. Bowman, 926 F.2d 380, 381 (4th Cir. 1991). Here, the PSR computation is based on Woody's statements that, from the spring of 1995, he bought one quarter to one half ounce of crack from McCorkle every week. He increased the amount later that year to two ounces of crack per week from McCorkle, and continued to buy one to two ounces of crack per week from Barrios when he took over the business until the latter's arrest in April 1997. Woody testified at trial as to these amounts and was subject to cross examination. Other customers bought crack cocaine as well. McCorkle asserts nothing that challenges the reliability of this information. Therefore, the findings of the district court concerning drug quantities are not clearly erroneous.

McCorkle next asserts that his two-level enhancement for obstruction of justice was improper because it was based on the same conduct for which he was indicted--interstate murder for hire and attempted murder of a witness--and therefore constituted double counting.

The district court's factual findings on obstruction of justice will be overturned on appeal only if clearly erroneous. Its legal interpretations are subject to de novo review. United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989). Under USSG § 3C1.1, a defendant's offense level may be increased two levels if he attempted to or did willfully obstruct or impede the administration of justice during "investigation, prosecution, or sentencing" of an offense. Application note 6 provides that, where a defendant is convicted for an obstruction of justice offense, the adjustment is not to apply except where "a significant further obstruction occurred . . . ." This note is intended to avoid double counting of the offense. United States v. Harris, 104

11

F.3d 1465, 1477 (5th Cir.), <u>cert. denied</u>, ___ U.S. ___, 66 U.S.L.W. 3256 (U.S. Oct. 6, 1997) (No. 96-9169).

McCorkle is wrong that his obstruction of justice enhancement was based on the underlying offense conduct. The district court based the enhancement on the fact that McCorkle's testimony at trial concerning the murder for hire counts was perjurious. This was not double counting the interstate murder for hire and attempted murder of a witness, but an enhancement for further attempts at obstruction of justice. The district court found the testimony to be knowing and materially false testimony. <u>United States v. Dunnigan</u>, 507 U.S. 87, 94-95 (1993). Thus, this claim lacks merit.

McCorkle received a four-level enhancement to his base offense level under USSG § 2A2.1(b)(1)(A) (1995), on the ground that Michael Hughes sustained "permanent or life-threatening bodily injury." McCorkle argues that he should have received instead a two-level increase under USSG § 2A2.1(b)(1)(B) for serious bodily injury.

Permanent or life-threatening injury is defined as"injury involving a substantial risk of death; loss or substantial impairment of the function of a bodily member, organ, or mental faculty that is likely to be permanent, or an obvious disfigurement that is likely to be permanent." USSG § 1B1.1, comment. (n.1(h)). In contrast, serious bodily injury is defined as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG § 1B1.1, comment. (n.1(j)).

Because of the permanent damage to his arm, Michael Hughes will not be able to maintain his chosen career as a state trooper. He has retained enough use of his arm to perform day-to-day activities such as grooming himself. But he cannot perform the more strenuous activities required of a state trooper. We hold that this injury is the permanent, substantial impairment of a bodily member contemplated by the guideline.

Next, McCorkle asserts that all statements and evidence related to the seizure of cocaine by Trooper David Hughes should be suppressed, as the seizure violated his Fourth Amendment rights. We

review de novo whether a seizure is justified based on a particular situation, but we review factual findings under a clearly erroneous standard. United States v. Perrin, 45 F.3d 869, 871 (4th Cir. 1995).

An officer who observes a traffic violation has probable cause to stop the car. Whren v. United States, 517 U.S. 806, 810 (1996). David Hughes testified that McCorkle was speeding. McCorkle presented an Illinois driver's license, although the car had Virginia tags and was not registered to him. McCorkle appeared extremely and unusually nervous, to the point that his hands and legs were trembling and his face was twitching. After Hughes asked McCorkle to step into his cruiser, McCorkle avoided eye contact and was sweating, although it was a cold night.

Hughes called for backup because of McCorkle's extreme nervousness. In addition, the trooper was concerned that McCorkle might attempt to flee, because of the way he kept eying the door handle and seemed to be inattentive to the trooper. McCorkle acknowledged that, although it was not his car, there might be some marijuana in the car. When the backup arrived, a canine scan was performed and the dog alerted to the car. The troopers searched the car and discovered the kilogram of cocaine.

The trooper was entitled to stop the speeding car, and Hughes then observed physical actions and responses that could reasonably lead him to be suspicious. McCorkle admitted to the possibility that the car held marijuana, and this provided probable cause for the canine sweep. When the dog alerted, the subsequent search was justified. No more than fifteen minutes passed in the entire episode. There was no violation of the Fourth Amendment which would entitle McCorkle to suppress his statements and the drugs discovered in the car.

Finally, McCorkle challenges the district court's order disqualifying Patrick Hoover as his counsel. Hoover represented McCorkle on the state charges resulting from the traffic stop and had represented him previously. Hoover also had previously been counsel for Scott Johnson, a witness against McCorkle. The prior representation of Johnson related to drug usage and trafficking. Johnson refused to waive his Sixth Amendment privilege as to Hoover. The Government moved to disqualify Hoover because of this conflict of interest, and

13

Hoover acknowledged the conflict. The district court ruled that allowing Hoover to remain in the case would compromise the system, as Hoover would be "unable to fully and aggressively cross-examine Johnson" without using knowledge gained by representing Johnson.

McCorkle argues that this ruling violated his Sixth Amendment right to counsel of his own choosing, and asserts that co-counsel could have handled Johnson as a witness. The Sixth Amendment right to choose one's counsel is circumscribed, however."Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. United States, 486 U.S. 153, 160 (1988). The district court has wide latitude in refusing to accept waivers of possible as well as actual conflicts. Id. at 163. Representation by counsel who had represented a significant potential witness for the Government poses a real risk of conflict, one that might not be eliminated by having co-counsel examine the witness. United States v. Williams, 81 F.3d 1321, 1325 (4th Cir. 1996). The district court did not abuse its discretion in disqualifying Hoover.

IV

Barrios raises two claims on appeal. First, he asserts that the Government failed to present sufficient evidence to support his conviction for using or carrying a .45 caliber semi-automatic pistol, in violation of 18 U.S.C. § 924(c). To sustain a conviction under § 924(c), the Government must prove: (1) that the defendant used or carried a firearm; and (2) that he did so during and in relation to a drug trafficking offense. United States v. Mitchell, 104 F.3d 649, 652 (4th Cir. 1997). The .45 caliber semi-automatic at issue here was sold by Peter Badalati to Barrios and McCorkle. James Abston brokered the deal, in which Badalati paid $850 and the gun, valued at $450, in exchange for an ounce of cocaine. According to Abston, Barrios and McCorkle both made the deal for the gun. Barrios grabbed the gun from McCorkle, cocked it, "slammed back the slide," then gave it back to McCorkle. When the latter could not work the gun, Barrios took it back and demonstrated again.

"Use" of a firearm to barter for drugs falls within the statutory definition of § 924(c). Smith v. United States , 508 U.S. 223, 240-41

14

(1993); see Bailey v. United States, 516 U.S. 137, 146 (1995). Viewing the evidence in the light most favorable to the Government, Barrios was deeply involved in the particular bargain through which he and McCorkle acquired the .45 in exchange for drugs. He was present when Abston arrived with the gun, and he handled it and showed McCorkle how to use it. Therefore, this claim is without merit.

Finally, Barrios asserts, as did McCorkle, that he did not act as an organizer, manager, or supervisor to five or more people, so that insufficient evidence sustains his conviction under 21 U.S.C. § 848. He admits that he supervised several people, "but never as many as five." Barrios admits he supervised Brian Baldwin and Jeffrey Palsa. Mimi Latt and Brian Riffey testified at trial that they sold cocaine for Barrios. Barrios taught Ray Atagan how to cut and package the drug and keep records, and provided him with a scale and baggies. He instructed Atagan how and when to dilute the drug.

Barrios hired two people, White and Sills, to kill Trooper Hughes. He offered them $25,000 for the job, took them to Maryland to see the officer's house, and suggested ways of accomplishing the deed. Viewing the evidence in the light most favorable to the Government, Glasser v. United States, 315 U.S. 60, 80 (1942), sufficient evidence supports Barrios's conviction for continuing criminal enterprise.

We have thoroughly reviewed the claims of these three Appellants, and find them to lack merit. Therefore, we affirm their convictions and sentences. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and oral argument would not aid the decisional process.

AFFIRMED

15