**UNITED STATES of America**

v.

**Jay E. LENTZ, Defendant.**

**No. 1:01CR150.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 22, 2005.

See, also, 419 F.Supp.2d 820, 352 F. Supp.2d 718.

Erik R. Barnett, Patricia M. Haynes, Steven D. Mellin, United States Attorney's Office, Alexandria, VA, for United States of America.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this remanded kidnapping for murder prosecution, defendant Jay E. Lentz ("Lentz") has moved to suppress a jailhouse informant's testimony regarding a murder-for-hire plot allegedly concocted by Lentz to eliminate certain key witnesses and the prosecutor in this case. This testimony, the government contends, is highly probative consciousness of guilt evidence.[1] Lentz seeks suppression of this evidence, arguing that its admission is barred by the Sixth Amendment given that the informant was a government agent and that the government knew Lentz was represented in this case. The questions presented, therefore, are whether the informant (i) acted as a government agent and (ii) directly solicited information from Lentz about the facts of his case, thus

requiring suppression of this testimony as a violation of defendant's Sixth Amendment right to counsel. After a three-day evidentiary hearing and argument of counsel, the matter is now ripe for disposition.

## I.

The facts relevant to the motion to suppress occurred following remand of this case for retrial and while Lentz was incarcerated at the Northern Neck Regional Jail (NNRJ) awaiting the retrial. Yet, a brief synopsis of the underlying kidnapping for murder prosecution and the procedural history of this case[2] provides the context essential to a full understanding of the questions presented.

Lentz and Doris Lentz ("Doris") were married in 1989. They had one child, Julia, born in 1991. During the marriage, Lentz verbally and physically abused Doris. The two separated in 1993 and the marriage ended in divorce in 1995. A bitter court dispute followed over issues of child support, child support arrearages, and marital property distribution.

On April 23, 1996, Doris disappeared. In her last reported conversation that evening, she told a friend that she intended to leave her home in Northern Virginia to pick up her daughter from Lentz's home in Maryland. No eyewitness ever saw Doris arrive at Lentz's house that evening. Indeed, no one ever saw or heard from Doris again and her body was never found. Five days later, authorities located Doris's abandoned car in a District of Columbia parking lot, on a route between the homes of the estranged couple, eight miles from

---

1. *See, e.g., United States v. Van Metre,* 150 F.3d 339, 352 (4th Cir.1998) (evidence of solicitation to kill witnesses is admissible as consciousness of guilt evidence).

2. The facts of the underlying case are more fully set forth in the Fourth Circuit's opinion

reversing the first trial court's judgment of acquittal, but upholding the grant of a new trial pursuant to Rule 33, Fed.R.Crim.P. *See United States v. Lentz,* 383 F.3d 191, 195 (4th Cir.2004) (*Lentz I*).

Lentz's home. The doors of the car were unlocked, Doris's purse was in plain view, the keys were on the passenger side floor, and the interior was stained with blood. Nearly all of the blood stains contained Doris's DNA, but one was a match for Lentz's DNA.

The government contends that Lentz, enraged by the ongoing court battle with his ex-wife and to avoid payment of court-ordered child custody payments, planned and carried out Doris's murder. According to the government, Lentz inveigled Doris across state lines (Virginia to Maryland) on the false pretense that she would be able retrieve Julia from Lentz's home after Julia's week-long visitation with Lentz and his parents in Indiana, when in fact Julia had traveled to Indiana alone and was not scheduled to return until a few days later. The government claims that when Doris arrived at Lentz's home to pick up Julia, Lentz held her, killed her, and disposed of her body.

Although the investigation into Doris's disappearance began immediately, Lentz was not indicted in federal court until five years later on April 24, 2001. He was incarcerated shortly thereafter and has remained in custody since that time. In the summer of 2003, Lentz was tried and convicted by a jury of kidnapping resulting in death, in violation of the Federal Kidnapping Act, 18 U.S.C. § 1201(a). Following the verdict, the trial court entered a judgment of acquittal and granted a motion for a new trial. *See United States v. Lentz,* 275 F.Supp.2d 723 (E.D.Va.2003), *rev'd in part,* 383 F.3d 191 (4th Cir.2004) (Memorandum Opinion); *United States v. Lentz,* Case No. 1:01cr150, 2004 WL 3670544 (E.D.Va. Jan. 29, 2004) (Memorandum Opinion). On appeal, the Court of Appeals overturned the district court's judgment of acquittal, but upheld the district court's decision to grant a new trial because certain evidence not admitted by the trial court had found its way into the jury room. *See United States v. Lentz,* 383 F.3d 191, 195 (4th Cir.2004) (*Lentz I*). Accordingly, the matter was remanded for a new trial to be conducted by a different district judge. *See id.* at 221. On remand, the matter was initially scheduled to be retried on January 31, 2005, but then continued until July 11, 2005 to accommodate the trial schedule of one of Lentz's two attorneys. *See United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. Dec. 22, 2004) (Order). The retrial is now scheduled to commence on November 28, 2005.

During the interim between the remand of this case and the scheduled July 11 trial date, the case took a surprising twist. On May 19, 2005, the government in an *ex parte*, under seal pleading represented that it had information from Christopher Jackmon, who had been incarcerated with Lentz at Northern Neck Regional Jail (NNRJ) from late 2004 until early 2005, to the effect that Lentz had discussed his case with Jackmon and had solicited Jackmon's help in a plot to kill certain key prosecution witnesses that Lentz believed had provided particularly damaging testimony in his first trial and one or both of the prosecutors in his case, namely Assistant United States Attorneys Steven D. Mellin and Patricia M. Haynes. Specifically, Lentz had allegedly (i) asked Jackmon to contact a "hit man" to kill these witnesses and prosecutors; (ii) provided Jackmon very specific instructions about each witness, and (iii) given Jackmon specific instructions on how the hit man could carry out the murders without being detected. The government reported that Jackmon had contacted AUSA Mellin, one of the prosecutors then assigned to the

case,[3] and Special Agent Bradley Garrett, the case agent, with the information concerning the alleged murder-for-hire plot. In addition, the government represented that it was in possession of certain recordings of telephone conversations between Lentz and his attorney while Lentz was incarcerated at NNRJ that appeared to corroborate Jackmon's allegations of a plot to by Lentz to kill witnesses and a prosecutor.[4]

In the circumstances and given the nature of both Jackmon's allegations and the recorded telephone calls, the government appropriately established, in addition to the existing trial team of prosecutors, a second and distinct team of prosecutors to investigate the murder-for-hire plot as well as a third team to review the telephone call recordings. The government also appropriately took steps to ensure that the trial team was not informed of either Jackmon's allegations concerning the murder-for-hire plot by Lentz or the tape recordings of Lentz's telephone calls by his attorney. Additionally, the government also

took steps to ensure that access to the telephone recordings was restricted to the third team.

Following an in camera motion, the government was directed to deliver promptly to defense counsel a copy of the under seal motion and its attachments. *See United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. May 20, 2005) (Order).[5] Lentz was then allowed a period to conduct his own investigation, after which he moved to suppress all statements and derivative evidence stemming from "the government's use" of Jackmon as a jailhouse informant, including all evidence of the murder-for-hire plot. According to the defense, Jackmon is an experienced jailhouse snitch who has a long history of cooperation with the government. The defense further contends that recordings of Jackmon's telephone calls as an inmate at the NNRJ revealed that the government hand-picked Jackmon to be an informant in Lentz's case, and that it did so to create a conflict of interest and disqualify Frank Salvato, one of Lentz's two court-appointed attor-

**3.** AUSA Mellin is no longer a member of the government's prosecution team in this case. The government's prosecution team now consists of AUSA Haynes and AUSA Erik R. Barnett.

**4.** In these recordings, Lentz apparently solicits information from his attorney, Frank Salvato, in furtherance of the plot. Mr. Salvato refused to provide the information and properly instructed Lentz not to carry out the plan. A companion memorandum opinion will address whether a government taint team may disclose these tape recordings to the government trial team in this matter for use at the retrial or whether use or disclosure of the recordings would violate the attorney-client privilege or Lentz's Sixth Amendment rights.

**5.** The government filed an *ex parte* motion under seal seeking an order permitting the government team investigating the taped calls to disclose the transcripts of those calls, as well as the recordings of the calls themselves, to both the trial team and the team investigat-

ing the murder-for-hire plot. That motion was denied.

Of course, as a general rule, judicial records and proceedings should be public and accessible to the public, unless compelling circumstances require otherwise. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597–98, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (stating that judicial records and documents are generally available to the public); *Media General Operations, Inc. v. Buchanan,* 417 F.3d 424, (4th Cir.2005) (same). In this case, however, a departure from this general rule is warranted to avoid publicity that might taint the jury pool as news of an alleged murder-for-hire plot might do. *See In the Matter of Application and Affidavit for a Search Warrant,* 923 F.2d 324, 332 (4th Cir. 1991) (upholding magistrate judge's decision to seal pretrial proceedings "to protect a fair trial from untoward prejudicial pretrial publicity").

neys.[6] The potential conflict would arise, according to Lentz, because Mr. Salvato previously represented Jackmon on a prior conviction and in two Rule 35 proceedings for reduction of Jackmon's sentence based on substantial cooperation with the government.

The parties fully briefed and argued the suppression issues and the matter came on for a three-day evidentiary hearing.[7] The defense presented testimony from a string of inmates who previously served time with Jackmon or Lentz or both of them, including John L. Lewis, Frederick Miller, Christopher Tucker, Arnell Croxton, Brandon McBrayer, Robert Jackson, and Eric Weeks. The defense also presented testimony from Daniel K. Dorsey, Jackmon's current defense lawyer, Bobby R. Stafford, Jackmon's former defense lawyer and employer, Barbara Jackmon, Christopher Jackmon's mother, SA Garrett, and AUSA Mellin. The government presented the testimony of Major Ted Hull, Assistant Superintendent of the NNRJ, James E. Rogers, a technician from the company that controls NNRJ's inmate telephone system, and Dwayne P. Miller and Gregory A. McCrae, who were also previously incarcerated with Lentz and/or Jackmon. The three-day hearing focused chiefly on two issues central to the suppression motion at bar: (i) whether Jackmon was acting as a government agent when he obtained information from Lentz concerning the alleged plot to kill certain government witnesses and a prosecutor and (ii) whether Jackmon actively solicited information from Lentz about his case.

## II.

Before parsing the record to determine the appropriate facts, it is useful to set out some of the general principles of the governing law as these principles serve as the

---

6. Although Lentz, if convicted in the retrial, is not subject to the death penalty, he is still entitled to two attorneys. Thus, he is also represented in this case by a second attorney, Amy Austin of this district's Federal Public Defender's Office. *See* 18 U.S.C. § 3005; *United States v. Boone*, 245 F.3d 352, 358 (4th Cir.2001) (holding that § 3005 establishes a right to two attorneys where the death penalty may be imposed, even if the government does not ultimately seek the death penalty) (citing *United States v. Watson*, 496 F.2d 1125 (4th Cir.1973)).

7. For purposes of the suppression hearing and to avoid an actual conflict of interest, a third defense attorney, William Cummings, was appointed to represent Lentz in Mr. Salvato's stead, for the specific and limited purpose of the suppression hearing. Mr. Salvato appropriately recognized that he might face a potential conflict of interest if he were required to cross-examine Jackmon, a former client whom Mr. Salvato had represented during a period of significant government cooperation. The district court conducted a further inquiry into the conflict, and concluded that the conflict was not merely potential,

but actual. *See Wheat v. U.S.*, 486 U.S. 153, 159–60, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) ("[A] court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel."). When asked whether he wished to waive his right to conflict-free counsel, Lentz's answer was equivocal. In any event, even assuming Lentz had clearly waived his right to conflict free counsel, the integrity of the judicial process required the appointment of a separate attorney to represent Lentz (jointly with Ms. Austin) on the suppression issue and to cross-examine Jackmon. *See United States v. Williams*, 81 F.3d 1321, 1324 (4th Cir.1996) ("[E]ven if one or all defendants provide explicit waivers of their rights to conflict-free representation and thus declare themselves willing to risk the harm that might come from a hedged cross-examination ..., the court must yet be free to insist on separate representation in order to vindicate its own 'independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.'") (quoting *Wheat*, 486 U.S. at 160, 108 S.Ct. 1692).

lens of relevancy through which to view the record. The pertinent principles of governing law are found in the Supreme Court's decision in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) and its progeny. That line of cases holds that a criminal defendant's Sixth Amendment right to counsel is violated when incriminating statements are admitted against the defendant at trial if (i) a government agent (ii) "deliberately elicited" those statements from the defendant after indictment and outside the presence of counsel. *Id.* at 206, 84 S.Ct. 1199; *see also United States v. Love*, 134 F.3d 595, 604 (4th Cir.1995). The first inquiry—whether an inmate witness acted as a government agent in eliciting information from a defendant—turns on "whether the actions of the inmate witness[ ] ... can properly be attributed to the state." *See Thomas v. Cox*, 708 F.2d 132, 135 (4th Cir.1983); *United States v. Henry*, 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). And the second inquiry—deliberate elicitation—recognizes that the "primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation;" thus, the "Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *See Kuhlmann v. Wilson*, 477 U.S. 436, 459, 106 S.Ct. 2616, 91 L.Ed.2d

364 (1986). Put differently, the inquiry is whether a person obtains information by serving as a mere "listening post" or instead "[participates] in active conversation and [prompts] particular replies." *Id.* at 459 n. 19, 106 S.Ct. 2616. At the outset, it is also important to note that Lentz, as the moving party, bears the burden of proof on a motion to suppress.[8]

## III. FINDINGS OF FACT [9]

### A. Christopher Jackmon

1. In June 1997, Jackmon was sentenced to 420 months in prison for possession with intent to distribute fifty grams or more of cocaine base in violation of 21 U.S.C. § 841(a)(1) and possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c). Owing to extensive cooperation with the government, Jackmon's sentence was later reduced to 65 months. Specifically, Jackmon provided information to the government that led to successful prosecutions of several members of his drug ring and he also provided information in four cases where inmates confessed incriminating information to Jackmon while in jail. As a result, the government filed two motions for downward departures pursuant to Rule 35, Fed.R.Crim.P., and Jackmon's sentence was reduced to 65 months.[10] After serving his sentence, Jackmon was re-

8. *See, e.g., United States v. Chaar*, 137 F.3d 359, 363 (6th Cir.1998); *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980); *see also United States v. Henry*, 447 U.S. 264, 277, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (Powell, J., concurring) ("To demonstrate an infringement of the Sixth Amendment, *a defendant must show* that the government engaged in conduct that ... is the functional equivalent of interrogation.") (emphasis added); *Kuhlmann v. Wilson*, 477 U.S. 436, 463, 469, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) ("[T]he *defendant must demonstrate* that the police

and their informant took some action ... that was designed deliberately to elicit incriminating remarks.") (emphasis added).

9. The facts recited here are those found from the record as a whole, pursuant to Rule 12, Fed.R.Crim.P., including the hearing transcript and exhibits.

10. Mr. Salvato represented Jackmon in the course of Jackmon's 1997 guilty plea and in each of his Rule 35 motions for downward departure.

leased from prison and placed on supervised release.

2. On April 4, 2004, Jackmon pled guilty to possession with the intent to distribute more than 500 grams of powder cocaine in violation of 21 U.S.C. §§ 841(a)(1) & 846. His plea agreement contained standard plea agreement language requiring him to "cooperate fully and truthfully with the United States" and to provide to the government all information known to him regarding any criminal activity. Additionally, certain standard plea agreement language concerning a potential downward departure for providing substantial assistance to the government was omitted. Daniel Dorsey, Jackmon's lawyer during the plea negotiations, testified that this omission was intended to communicate that the government did not plan to file any further Rule 35 motions for Jackmon, but that the omission of this language, of course, does not preclude the government from filing such a motion.

3. On July 2, 2004, Jackmon was sentenced to 200 months imprisonment on the drug trafficking charge and a consecutive term of 45 months imprisonment for violating the terms of his supervised release on his previous conviction for drug trafficking.

**B. Transfer to Northern Neck Regional Jail**

4. On November 4, 2004, Jackmon was transferred to the Eastern District of Virginia from Federal Correctional Institution in Oakdale, Louisiana, where he had recently commenced serving his 245–month sentence. After a short four-day stint at the Alexandria Detention Center, Jackmon was transferred to the Northern Neck Re-

gional Jail (NNRJ) where Jay Lentz was also housed at the time.

5. Jackmon was transferred to Virginia pursuant to a writ executed by Assistant United States Attorney Jonathan Fahey so that Jackmon could attend a debriefing in connection with an ongoing grand jury and DEA drug trafficking investigation. The transfer was unrelated to Lentz's case and the *Lentz* case prosecutors and the case agent were unaware of the decision to "writ" Jackmon to the Eastern District and played no role in this decision.

6. When Jackmon arrived at the NNRJ, he was assigned to Unit C or "C Pod," a housing unit with twelve cells arranged on two tiers around a central common area. Lentz was also housed in C Pod and been housed there since September 15, 2004. Jackmon was assigned a cell on the bottom tier with a roommate. Lentz was housed alone in a cell on the top tier.

7. Jackmon was not transferred to NNRJ to act as an agent for the government in connection with the *Lentz* case. Nor was Jackmon placed in Lentz's pod at the government's behest, direction, or influence; the proximity of the two was wholly a matter of coincidence. Major Hull credibly testified that no person in the federal government made any special request regarding Jackmon's placement. Rather, the decision to place Jackmon in C Pod, as a matter of routine, was based on penological concerns including space needs, separation of certain inmates, and Jackmon's security level determined by way of a standardized classification system.[11]

11. Jackmon later told his mother in a November 19, 2004 phone conversation that it was "just like they ... put me in with the dude [Lentz] for a reason because it's like they already know that I probably would get infor-

mation from him." Confronted with this at the hearing, Jackmon admitted that no person from the government had ever told him that he had been intentionally placed in the same unit with Lentz nor did any government agent

## C. Early Discussions Between Lentz and Jackmon

8. After a few days in Unit C at NNRJ, Jackmon met Lentz at the dinner table. While most prisoners in Unit C at the time came from Richmond or Norfolk, Lentz learned that Jackmon, like Lentz, had also been transferred from the Alexandria Detention Center. Jackmon and Lentz discussed their common experiences and people they both knew in Alexandria. As the conversation progressed, Lentz also told Jackmon that he had been charged with kidnapping and murder and that he had been transferred to NNRJ from Alexandria because he had written "Mellin=Liar" on his jumpsuit.

9. In the days that followed, Lentz and Jackmon continued to have conversations about topics of common interest. In further conversations, Lentz discussed some of the facts of his case. According to Jackmon, he never actively elicited any of this information from Lentz; instead, Lentz volunteered this information in the course of their conversations. Jackmon testified that Lentz described two assaults of his ex-wife in 1991 and 1994 and said he knew his kidnapping case was over when the trial court ordered him to turn over two DNA samples. Lentz also told Jackmon that the government would never locate Doris Lentz's body.

## D. November 19, 2004 Debriefing of Jackmon

10. Jackmon was returned to Alexandria on November 19, 2004 for a debriefing at the U.S. Attorney's Office. In addition to AUSA Fahey, who was present at the meeting for only a short time, Special Agent Bill Hein of the DEA, a second government agent, and Jackmon's lawyer, Mr. Dorsey, also attended the meeting. The subject of the debriefing was limited to Jackmon's knowledge of certain drug trafficking crimes. There was no discussion regarding Lentz or the facts of Lentz's case and neither AUSA Mellin nor SA Garrent were aware that Jackmon was visiting the U.S. Attorney's Office or that Jackmon had been speaking with Lentz.

11. During the course of the November 19, 2004 visit to the U.S. Attorney's Office, Jackmon informed Dorsey that he had information about the *Lentz* case,[12] but did not tell him any specific information he had learned.

12. After the debriefing, Jackmon was returned to the U.S. Marshal's lock-up and Mr. Dorsey went to speak with AUSA Mellin. The conversation was brief. Dorsey told AUSA Mellin that he had a client with information about the *Lentz* case who was downstairs in the lock-up and recommended that AUSA Mellin have Jackmon brought back upstairs to speak with him. AUSA Mellin expressed casual interest, but no particular enthusiasm, as Mellin noted that Jackmon was certainly not the first inmate to contact him with information about the *Lentz* case. Indeed, AUSA Mellin testified that up to ten people incarcerated with Lentz had contacted him claiming to have information about Lentz. Importantly, it is clear that AUSA Mellin said nothing to Mr. Dorsey to indicate that he would like Jackmon to learn the location of Doris Lentz's body, nor did he communicate to Mr. Dorsey that the gov-

---

ever instruct him to get information from Lentz.

**12.** Although it appears from the record that Jackmon initially told Dorsey he had informa-

tion about the "Lynch" case, there is no doubt Jackmon was referring to the *Lentz* case.

ernment would like Jackmon to help the government get Mr. Salvato off the case.[13]

13. An attempt was made to return Lentz from the lock-up, but for reasons that not disclosed in the record, Jackmon could not be returned to the U.S. Attorney's Office that day. At no time on November 19, 2004 did AUSA Mellin or any other U.S. government representative speak with Jackmon about the *Lentz* case. The first meeting between Jackmon and a government agent to discuss these matters did not occur until December 2, 2004. And, as AUSA Mellin's testimony makes clear, these later arrangements to meet with Jackmon were merely a part of Mellin performing routine job duties by investigating any potential lead in the *Lentz* case.

14. Before Jackmon was returned to NNRJ on November 19, Mr. Dorsey met with Jackmon in the lock-up for approximately ten minutes. Mr. Dorsey told Jackmon that AUSA Mellin would bring Jackmon back to speak with him about Lentz at a later date, but did not relay any additional information or instructions from AUSA Mellin. It appears, however, that Mr. Dorsey did advise Jackmon, *on his own initiative*, that Jackmon might be able to help the government by creating a conflict for Mr. Salvato.[14] Further, in a three-way phone conversation later that day with Jackmon and his mother, Mr. Dorsey repeated the suggestion that Jackmon's testimony could help the government by getting Mr. Salvato off the case. In the course of the hearing, Mr. Dorsey credibly testified that his statement in this

regard was solely his own surmise and that no one from the U.S. Attorney's Office directed, suggested, or in any way intimated to Mr. Dorsey that the government wanted to create a conflict of interest for Mr. Salvato.

15. When Jackmon returned to NNRJ, he made a series of telephone calls to family members, including his wife and mother, that were recorded by the jail's automated recording system.[15] During these conversations, Jackmon told his family (i) that he believed the government had assigned him to the same unit as Lentz so he would gather information from him, (ii) that the government wanted Jackmon to find out where the body was located, and (iii) that the government wanted Jackmon to help remove Mr. Salvato from the case by creating a conflict of interest. Jackmon testified at the hearing that in making these remarks he was merely speculating that the government had placed him in Unit C to elicit information from Lentz and that he had no basis for this speculation. Further, he denied that the government ever requested him to obtain any specific information from Lentz, including the location of the body. He also denied that any prosecutor or government representative ever suggested or intimated to him that the government would like to have Mr. Salvato removed from the case.

16. It is clear that these statements made to Jackmon's family over the telephone were embellishments and exaggerations; none were true. When presented

13. AUSA Mellin's testimony in this regard and throughout was clear, straightforward, and entirely credible.

14. Mr. Dorsey testified he believed that if Jackmon testified in the *Lentz* case, this would force Mr. Salvato, Lentz's current lawyer and Jackmon's former lawyer, to withdraw from the case to avoid a conflict of interest.

15. At NNRJ, all inmate telephone calls are recorded. Inmates cannot receive incoming phone calls from outside parties, but rather must place outgoing calls, all of which are made collect. Both the inmate and the recipient of the call are notified at the beginning of the call that the call is "subject to monitoring and recording."

with the inconsistencies between his statements in these telephone conversations and his testimony on the stand, Jackmon explained that his family had been threatened in the past as a result of his cooperation with the government. Thus, he testified that he misstated and exaggerated the importance of his role to assuage his family's concerns that the risks of his cooperation were worthwhile. Moreover, AUSA Mellin, SA Garrett, and Mr. Dorsey all convincingly and credibly denied that any government agent ever directed Jackmon to gather any specific information or suggested to him that the government would like to create a conflict of interest for Mr. Salvato. Whether the product of Mr. Dorsey's advocacy for his client or Jackmon's imagination, it is clear that the notions communicated to Jackmon's family were not the product of any government direction or suggestion.

### E. December 2 and December 16 Meetings with the Government

17. Over the course of the days that followed, Jackmon made repeated efforts to secure a meeting with someone from the U.S. Attorney's Office. Jackmon was concerned that if a meeting was not scheduled promptly, he would be returned to Oklahoma because he had completed his debriefing with AUSA Fahey. Jackmon repeatedly called his attorneys, Mr. Dorsey and Harry Tun, asking them to set up a meeting with AUSA Mellin. He also asked his wife to contact the U.S. Attorney's Office on his behalf.

18. Between November 19 and December 2, neither Jackmon nor Mr. Dorsey had any substantive contact with AUSA Mellin, SA Garrett, or any other government representative regarding the *Lentz* case.

19. In December 2004, Jackmon met twice with SA Garrett and AUSA Mellin at the U.S. Attorney's Office in the Eastern District of Virginia, first on December 2 and then on December 16.[16] During these meetings, Jackmon told SA Garrett and AUSA Mellin that he had learned from Lentz certain information, including (i) that Lentz referred to his wife as "bitch," (ii) that Lentz had two altercations with his ex-wife, (iii) that Lentz referred to Doris as a "high-priced" whore and he could not control his anger toward her, (iv) that Lentz believed he made a mistake by forgetting to pull up the car seat in his ex-wife's car (to adjust it to her shorter height) after Lentz drove it on the night of the murder, (v) that Lentz believed he made a mistake by failing to use bleach to kill the blood found in the car, and (vi) that Lentz put his head down and turned red when the Scott Peterson verdict was announced.[17]

20. SA Garrett and AUSA Mellin listened to the information Jackmon provided and gave him two instructions. First, they instructed Jackmon that he should be only a "listening post." In other words, Jackmon was told that he should not directly solicit any information from Lentz or ask questions about Lentz's case. Yet, if Lentz wished to speak about his case, without prompting from Jackmon, Jackmon certainly was free to listen. And Jackmon could report that information back to the government, but he was not instructed that he was under an obligation

---

**16.** The second meeting was scheduled not at AUSA Mellin's request, but because Jackmon continued to call SA Garrett saying he had more information about Lentz.

**17.** AUSA Mellin and Mr. Dorsey both took notes during these meetings, but SA Garrett did not. Lentz's claim that SA Garrett did not take notes because AUSA Mellin instructed him not to do so is unfounded and clearly rebutted by the testimony in the record.

to do so. The instruction to be a listening post was repeated two or three times to ensure that Jackmon understood. Second, Agent Garrett told Jackmon that he could "personalize" the conversation. In other words, he could talk with Lentz about "subjects of common interest"—*e.g.*, family, children, or the difficulties of being locked up—but he could not engage Lentz in any conversations about his case.

21. When Jackmon attempted to apologize for the fact that he had been arrested a second time for trafficking in drugs, AUSA Mellin said "don't worry about the drugs." It is clear from the record that this statement was not intended to be a promise or an offer to reduce Jackmon's sentence in exchange for information; instead, as AUSA Mellin testified, it was an effort "to truncate what [he] thought was going to be a long meeting, to try to focus ... on the issue of the day," namely the information Jackmon had learned from Lentz.[18] In other words, AUSA Mellin's remark simply meant that drug trafficking was not the reason for the meeting.

22. AUSA Mellin made no promises of leniency to Jackmon in exchange for the information tendered. Any "hope" Jackmon had of a reduction of his lengthy sentence in exchange for information he might be able to provide in the *Lentz* case was not encouraged by the government and entirely the product of Jackmon's own optimistic hope.[19]

23. After the second meeting with Jackmon on December 16, 2004, AUSA Mellin testified that he then had no intention of calling Jackmon to testify in the *Lentz* case and that the government gave Jackmon no assurances that he would be used in Lentz's retrial. Indeed, AUSA Mellin remembers walking out of the December 16 meeting thinking, "We're done with Chris Jackmon."

24. Following these meetings with SA Garrett and AUSA Mellin, Jackmon again placed a series of calls to his mother, wife and attorneys. In the course of these conversations, he reported (i) that he thought he would be out in less than a year, (ii) that AUSA Mellin said he did not care about the drugs, (iii) that Jackmon was "working for them [*i.e.* the government]," (iv) that a government agent had told him "just go at him like this," and (v) that he felt "pressured" to get more information from Lentz. Importantly, Jackmon also said repeatedly in these calls "I'm not going to solicit any information from anybody. It's not going to happen. I'm not going to do that." SA Garrett, AUSA Mellin, Mr. Dorsey and Jackmon all denied that either SA Garrett or AUSA Mellin ever pressured or requested Jackmon to obtain additional information from Lentz. It appears that Jackmon made these statements in the telephone calls for the benefit of his family and that they do not reflect the substance of the conversations with the government.[20]

---

**18.** Jackmon testified that he understood AUSA Mellin's statement to mean, "It's water under the bridge. You made this mistake. You have to live with it."

**19.** SA Garrett testified that he made approximately three three-way phone calls for Jackmon on different occasions so that Jackmon would not have to charge the cost of the collect call to the recipient. As noted *infra,* these phone calls are not sufficient to estab-

lish an agency relationship. *See infra* note 36.

**20.** The record reflects that SA Garrett may have given Jackmon a copy of his business card, but this merely indicates that SA Garrett wanted Jackmon to have a way to reach him directly if he learned more information and wished to share it with the government; it does not establish that Jackmon had become a government agent.

25. There is no persuasive evidence that Jackmon ever acted as anything more than a listening post in his interactions at any time prior to December 16, 2004.

### F. Deliberate Solicitation Prior to December 29, 2004

26. With respect to conversations between Jackmon and Lentz from December 16 through December 29, 2004, the evidence is in equipoise as to whether Jackmon deliberately solicited or elicited the information he obtained from Lentz during this period, or whether he instead acted, as directed by the government, as a mere "listening post." The evidence does not preponderate in favor of a finding that Jackmon deliberately solicited or elicited information from Lentz during this period.

27. Jackmon is the only witness who testified about the specifics of his conversations with Lentz. It is clear that he is sometimes truthful and sometimes not.[21] No other witness ever overheard their conversations. While there was much testimony regarding the number of times Lentz visited Jackmon's cell or vice versa,[22] it establishes only that Jackmon and Lentz spoke regularly and that each regularly initiated conversations with the other.

Each witness to observe the two in C Pod also testified that Lentz and Jackmon stopped talking when others came within earshot and that none of them ever overheard Jackmon asking questions of Lentz. Thus, there is no evidence that squarely rebuts Jackmon's testimony that he did not elicit information.

28. Nonetheless, it is reasonable to be suspicious of Jackmon's testimony that he did not directly elicit information from Lentz. The record also reflects that Jackmon is prone to exaggeration—he regularly fabricated and embellished stories of his conversations with the government, and he also invented or exaggerated the importance of his relationship with the government to pacify his family's concerns about the risks of his cooperation. According to some of the witnesses previously incarcerated with Jackmon, Jackmon told exaggerated stories about women, his cars, and his homes before being incarcerated. Moreover, Jackmon likely knew from his past experience that if he testified that he had deliberately elicited information from Lentz that this might lead to the suppression of his testimony. Of course, this evidence cuts both ways—given Jackmon's experience cooperating with the govern-

---

21. Notably, both the government and Lentz have argued that Jackmon's statements should be credited in some contexts but not others. The government relies on Jackmon's statements that he did not actively solicit information from Lentz, but argues that Jackmon's statements to his family should not be trusted. Lentz, on the other hand, contends that Jackmon lied in his testimony on the stand regarding whether he solicited information from Lentz, but that his statements to his family regarding his conversations with the government represent the true version of the events at the December 2 and December 16, 2004 meetings. In general, Jackmon's trial testimony was credible and has been credited over his conflicting out-of-court statements.

22. Various inmates testified in this regard. Frederick Miller testified that he saw Jack-

mon enter Lentz's cell on five occasions. Arnell Croxton, Jackmon's roommate for a time in C Pod, testified that Lentz and Jackmon were always in and out of each other's cells and that Lentz frequently came to Jackmon's cell. Brandon McBrayer also testified that the two frequently visited each other's cells. Robert Jackson, who by virtue of his demeanor, manner, and his criminal record, was not credible on the stand, *see infra* page 808, claimed he saw Jackmon visit Lentz's cell two to three times a day. Gregory McCrae testified that he mostly saw Lentz in Jackmon's cell. The record does not support Lentz's contention that it was Jackmon who always initiated conversations by going to Lentz's cell.

ment in the past, he certainly knew that if he acted as mere a listening post, it would jeopardize any benefits he might receive for his cooperation.

29. Defendants also point to other testimony that arguably raises doubts about Jackmon's credibility and his testimony that he did not directly elicit information from Lentz.[23] Most significantly, Frederick Miller, who was also housed in C Pod, testified that Jackmon told him (i) that Lentz was "his ticket out," (ii) that "that cracker would not open up to me," and (iii) that he had the government "in my back pocket."[24] Importantly, Miller was a late arrival in this series of events; he was not assigned to C Pod until December 28, 2004. Miller's arrival date is significant because his testimony, which points more

persuasively to proof of deliberate elicitation than that of any other witness, relates primarily to a time period, namely after December 30, 2004, when it appears that Jackmon and the government did begin to attempt to elicit information from Lentz.

30. Lentz also notes, as the parties stipulated, that if AUSA Neil Hammerstrom were called to the stand, he would testify to at least two instances known to him in which he believed Jackmon had lied to law enforcement officials.[25]

31. Other witnesses testified that, in the course of Jackmon's first incarceration on drug trafficking charges beginning in 1997, Jackmon had elicited information from them and other inmates. John Lewis testified that Jackmon, Lewis's cellmate in 1999, tricked him into giving Jackmon in-

---

23. Lentz also offered other evidence that he claims points to the conclusion that Jackmon was deliberately eliciting information from Lentz, including (i) that Jackmon asked his wife, Lovie, to find out who Lentz's lawyer was; (ii) that certain articles about Lentz's case were cut out and missing from newspapers in C Pod; (iii) that Frederick Miller said that Jackmon told him that he had articles in his cell about Lentz's case that he destroyed in anticipation of a "shakedown" of the cells in C Pod; and (iv) that in a November 30, 2004 phone conversation, Jackmon told his wife or mother that due to his work experience as a "legal assistant, and investigator" for Bobby Stafford (Jackmon's former lawyer and former employer), Jackmon was "very clever" and did not "have to hear you say something to know what you're thinking." Yet, these facts, at best, are only slightly probative on whether Jackmon directly elicited information from Lentz concerning the alleged plot by Lentz to kill certain government witnesses and a prosecutor.

There was also testimony that Jackmon was seen taking notes while speaking to others about their cases. Although Lentz argues that this is further evidence that Jackmon was actively probing inmates for information, this fact does not weigh in favor or against a finding of deliberate elicitation. An inmate who hopes to receive favorable treatment

from the government in exchange for his cooperation is equally likely to take notes of incriminating statements whether he obtains the information as a passive listening post or in response to targeted questions.

24. Eric Weeks also testified that Jackmon would say to him "I'm going up [to Lentz's cell] and mess with Mr. Lentz and that he went to Lentz's cell two or three times a day." Yet, given Weeks' demeanor, clear exaggerations, and evasive answers on the stand, his testimony was simply not credible.

25. The two instances are as follows: First, a person driving an automobile registered to Jackmon fled from police at a high rate of speed and eluded them in February 2004. Although an associate of Jackmon's later told law enforcement agents that Jackmon had admitted to eluding police in a high-speed chase in February 2004, Jackmon denied any involvement in the incident when he was later arrested. Second, Jackmon was pulled over by Fairfax County Police in December 2003 and found with $10,000 inside the driver's side door of the car and on Jackmon's person. Jackmon initially denied that the money was derived from drug trafficking, claiming that it was from his work as a car salesman. Later Jackmon admitted that he was, in fact, dealing cocaine and named his drug suppliers and customers.

formation about an unsolved bank robbery in which Lewis had participated. Lewis did so on the mistaken belief that Jackmon would help him use the information to get a reduced sentence by testifying against his co-conspirators. Lewis testified that Jackmon asked him specific questions about the robbery, including "Who was driving?" "Who was there?" and "Did someone have a gun?" Instead of helping Lewis, Jackmon gave the information to the government and then testified against Lewis, resulting in the latter's conviction for bank robbery.[26] Lewis also testified that he observed Jackmon ask other inmates about the details of their cases. Similarly, Robert Jackson testified that he was incarcerated in the same pod as Jackmon and Lewis at the Prince William County Jail and that when Jackson brought up his bank robbery case, Jackmon followed up with specific questions about his case that Jackmon later used to testify against Jackson.

32. Evidence that Jackmon elicited information in previous cases, while relevant,[27] is not persuasive that Jackmon deliberately elicited information from Lentz in this case at any time prior to December 29, 2004. What is more, the testimony of these defendants is suspect. Not only are Lewis and Jackson both repeat felons, but they have a strong incentive, *i.e.* revenge, to lie here to harm Jackmon. Specifically, Lewis admitted while testifying that he blames Jackmon for the 30 months he

spent in prison. And Jackson's claim that he does not blame Jackmon is simply not credible.[28]

33. In sum, there is evidence that Jackmon deliberately elicited information from inmates in the past, and thus circumstantially that he may have done so with respect to Lentz prior to December 29, 2004. Yet, there is also substantial evidence that Jackmon did not deliberately elicit information from Lentz during this period. In the end, the evidence on this issue for the period between December 16 and December 29, 2004 is in equipoise, and hence Lentz has not carried his burden of showing that Jackmon acted during this period as more than a listening post.[29]

## G. December 29, 2004—The Murder-for-Hire Plot

34. Jackmon testified that on December 29, 2004, Lentz approached him and told him that his trial was being continued from January 31 until July, 11 2005 because his attorney, Mr. Salvato, was also involved in a trial for the murder of a female government witness that conflicted with the trial schedule originally set in his case. When Jackmon expressed disapproval of an attempt to murder a witness, saying the situation was "f----- up," Lentz disagreed, saying "this is combat." Lentz, who mistakenly believed that Jackmon had not yet been convicted, asked Jackmon if he would pay $10,000 to have a key witness killed if he could avoid his twenty year

---

**26.** Importantly, Jackmon elicited this information from Lewis while Lewis was incarcerated for malicious wounding, but had not yet been charged with bank robbery; thus, his Sixth Amendment right to counsel during an interrogation had not yet attached with respect to that charge. *See McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (holding that a defendant's Sixth Amendment right to counsel is "offense-specific" and "cannot be invoked once for all future prosecutions, for it does

not attach until a prosecution is commenced . . . .").

**27.** See F.R.E. 404(b) (listing, *inter alia*, "plan" as a permissible non-propensity use of character evidence).

**28.** *See also supra* note 22.

**29.** As noted *supra* ¶ 25, the evidence convincingly preponderates against a finding of deliberate solicitation or interrogation by Jackmon for any time prior to December 16, 2004.

sentence. Jackmon responded that "crackheads" would kill a witness for as little as $2,000 or $3,000. When Lentz heard this, he responded, "I wish I had known that a few years back."

35. According to Jackmon, Lentz then proceeded to tell him about two key witnesses he would like to have killed: his daughter Julia's "baby sitter" [Marilyn Sauder], who had testified in the first trial that Lentz told her Doris came to see him on the night she disappeared, and a man named "George [George Stevens]," who had testified at the first trial that Doris asked him to accompany her to pick up Julia because she feared that Lentz would try to harm her. Jackmon says Lentz went on to describe the house in Maryland where Sauder lived and said that killing her in her home would be easy because Sauder's husband is a construction worker and leaves for work early in the morning. Lentz also told Jackmon that Sauder drove a van, that her husband drove a pickup truck, and that she had a 21–year–old son. According to Jackmon, Lentz told him a hit man should select a sunny rather than a rainy day to carry out the murder because this would ensure that Sauder's husband will have left for work before the hit man's arrival.

36. Lentz then asked Jackmon if he knew someone who could possibly help him

intimidate or kill witnesses. Jackmon responded that he could and offered to contact a person named "Mike." Lentz assured Jackmon that no one would ever attribute the murders of the witnesses in his case to the two of them because they would have "plausible deniability," as they were both incarcerated. When Jackmon asked him to define the term, Lentz wrote the definition on a piece of paper.[30] Jackmon provided this piece of evidence to the government.[31]

### H. December 30, 2004 Phone Call to SA Garrett

37. The next day, on December 30, 2004, Jackmon called SA Garrett and related the plot to him, including Lentz's question about whether Jackmon knew anyone who might be willing to perform a murder for hire. Jackmon also told SA Garrett that he had responded affirmatively to Lentz's inquiry and suggested that SA Garrett send an FBI agent to NNRJ with a fake ID to play the role of the hit man. SA Garrett did not immediately respond to this suggestion, but instead offered to bring Jackmon back to the U.S. Attorney's Office to discuss this new information. An important exchange then followed. As the conversation neared its end, Jackmon asked Garrett whether the infor-

---

**30.** The note defined "plausible deniability" as follows:

> Sim[ilar] to alibi. Plausible. Appearing true, believable or reasonable to a reasonable, fair person (jury), a man would seem to have a good reason for *not* being involved w. a crime ... poss w. alibi/witnesses to his actions or presence somewhere *else*.

**31.** The government also presented other evidence to corroborate Jackmon's claims that Lentz plotted to kill witnesses and the prosecutor in his case. Specifically, the government also presented the testimony of Durnell Miller, who testified that Lentz told him in early 2002, while they were both incarcerated

at the Alexandria Detention Center, (i) that his ex-wife "got what she deserved;" (ii) that he would "literally" "kill for [his] daughter;" (iii) that "if I lose, I'll take down the prosecutor and they'll have to kill me, it will be over quickly;" and (iv) that if Lentz were found guilty "he would kill guards in hopes of being killed." Notably, Miller has never cooperated with the government before and testified that most of these conversations took place in Miller's cell where Lentz volunteered this information. Arnell Croxton also testified that Lentz had said to him that his prosecuting attorney messed his life up and that he would like to "knock him off."

mation he had provided was "good," to which SA Garrett responded "you're getting there." Jackmon then prompted SA Garrett to tell him what additional information he wanted him to get to. Significantly, SA Garrett responded "the key is as much detail as you can get" and went on to suggest that Lentz could even end up telling Jackmon where he dumped Doris's body.[32]

38. On December 31, 2004, Jackmon told Lentz that he had contacted "Mike" and had arranged for him come to NNRJ on January 6, 2005 to speak with Lentz. He would use a fake ID so he could not be identified.

39. Jackmon testified that he spoke with Lentz again on January 1, 2005. According to Jackmon, Lentz showed Jackmon a newspaper article reporting that James Raleigh, a twenty-five-year-old man, had been murdered at Springfield Mall. Jackmon also testified that Lentz, knowing that Jackmon was from Springfield, incorrectly assumed that Raleigh was a witness in Jackmon's case and that Jackmon had taken steps to have Raleigh murdered. When Lentz showed Jackmon the article, Jackmon exclaimed, "Oh my god!" Apparently assuming that Jackmon's hit man, "Mike," had carried out the murder at Jackmon's request, Lentz told Jackmon, "your man moves fast." Lentz then told Jackmon that he had changed his mind about the witnesses he wanted murdered. Specifically, instead of killing "George" [George Stevens] and the "babysitter" [Marilyn Sauder], he wanted to intimidate the babysitter and have a different key government witness killed, a real estate agent named "D. Ives" [Diane Ives]. Lentz went on to describe in detail how he would instruct Mike to go about killing Ives. Spe-

cifically, Lentz told Jackmon that he would instruct the hit man to find a copy of Ives' real estate listings and to ask her to show him a secluded home for sale with more than one level. He was to use a knife to kill her and to use black trash bags, rather than white trash bags, to dispose of the body because blood can be seen through white trash bags. Lentz also suggested that he wear thick Teflon gloves to avoid leaving behind any of his own blood.

40. According to Jackmon, Lentz also said he wanted to have either AUSA Mellin or AUSA Haynes killed, but that he wanted to wait until May, closer to the date of his trial, to give the government less time to react and prepare for trial. Lentz also asked how much more it would cost to have a prosecutor killed, and Jackmon responded that it would probably be an additional $1,000.

41. On January 3, 2005, Jackmon spoke again with SA Garrett and suggested that he have a black agent come to meet with Lentz because he had told Lentz that "Mike" was black. He also bragged to SA Garrett that "I'm telling you it's going to work, man. I ain't never done nothing that hasn't worked. I mean, you're going to be real happy at the end."

42. On January 4, 2005, Jackmon went to Lentz's cell and found him drawing a map with directions to Ives' home. Lentz gave Jackmon a handwritten note with "D. Ives" name on it and Maryland telephone exchanges for Ives' home and work phones written on it. Jackmon turned this piece of paper over to the government.

## I. January Debriefing with the Government

43. On January 6, 2005, Jackmon met with AUSA Mellin, SA Garrett, and SA

---

**32.** When confronted with these statements, SA Garrett explained that he meant to say that any additional detail that Lentz happened to share with Jackmon would certainly be helpful, but that Jackmon should not deliberately elicit this information. Although SA Garrett may have meant to convey only this, his actual words went further.

Mark Datilio to report to them the information he had learned from Lentz. After the meeting, AUSA Mellin e-mailed ethics officers within the U.S. Attorney's Office and at the Department of Justice to request advice about using an undercover "hit man" to speak with Lentz in jail. An attorney at the Professional Responsibility Advisory Office of the DOJ responded and advised AUSA Mellin that this would not violate ethics rules.

44. On January 8, 2005, Jackmon went to Lentz's cell and Lentz discussed a contingency plan with Jackmon in case one or both of them were transferred away from C Pod. According to Jackmon, Lentz instructed him in the event of transfer, Jackmon should call Lentz's daughter Julia once a week and if she said something about a "female swimming tournament," Jackmon was to tell Mike to kill AUSA Haynes, the female prosecutor on his case. On the other hand, if Julia said something about a "male swimming tournament," Jackmon was to instruct Mike to kill AUSA Mellin. Lentz gave Jackmon a piece of paper with Julia's phone number and a key to remind Jackmon of the code: "Alex = code = swimming." "Alex" was Lentz's nickname for Jackmon because he came from Alexandria.

45. Lentz never met with the undercover agent. He cancelled the meeting after speaking with his attorney on January 10, 2005.[33]

## IV. CONCLUSIONS OF LAW

### A. Government Agency

46. Lentz has moved to suppress all of Jackmon's statements and derivative evidence relating to the alleged murder plot as a violation of Lentz's Sixth Amendment right to counsel. The suppression analysis properly begins with the determination whether, at any time relevant here, Jackmon acted as the government's agent. This is so because if Jackmon acted alone, then the admission of Lentz's statements would not violate his Sixth Amendment rights, even if Jackmon deliberately elicited the statements. *See Thomas v. Cox,* 708 F.2d 132, 136 (4th Cir.1983) ("[W]here the citizen himself actively, though surreptitiously, elicits disclosures, the only question is whether at the critical time he was also a creature—an agent—of the state.").

47. As noted, the inquiry whether an inmate witness acted as a government agent in eliciting information from a defendant turns on "whether the actions of the inmate witness[ ] . . . can properly be attributed to the state." *See Thomas v. Cox,* 708 F.2d at 135; *United States v. Henry,* 447 U.S. 264, 270, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). And, in this regard it is clear that "[t]he behavior of an informant who initiates contact with an indicted defendant—whether because of conscience, curiosity, or even potentially to curry an unpromised future favor from the government—cannot be attributed to the government." *Love,* 134 F.3d at 604. The inmate must be "a Government agent expressly commissioned to secure evidence." *Henry,* 447 U.S. at 273, 100 S.Ct. 2183; *Thomas,* 708 F.2d at 136. Notably, the point at which agency, or proper attribution, is established "is not subject to any bright-line test." *Thomas,* 708 F.2d at 136. The Fourth Circuit, however, has noted "crucial indicia of government coop-

**33.** For a discussion of the context and admissibility of this telephone conversation, *see United States v. Lentz,* Case No. 1:01cr150 (E.D.Va. August 22, 2005) (Memorandum Opinion).

eration," including (i) whether the government or the inmate witness initiated the contact; (ii) whether there is a history of previous cooperation with the government that "extended in any manner" to the present investigation, (iii) whether the informant received any instructions from the government, and (iv) whether the informant was paid for providing the information.[34] *See Love,* 134 F.3d at 604; *see also Henry,* 447 U.S. at 280, 100 S.Ct. 2183 (noting that an inmate witness acted as government agent when "acting under instructions as a paid informant"). In short, there must be some indicia of "prearrangement" or "ongoing cooperation" between the state and witness to implicate the state and thereby invoke Sixth Amendment protections. *Thomas,* 708 F.2d at 136.

■ 48. These principles, applied here, make clear that prior to December 30, 2004, Jackmon was not acting as a "Government agent expressly commissioned to secure evidence." *Henry,* 447 U.S. at 273, 100 S.Ct. 2183.[35] To begin with, the government did not initiate the contact with Lentz. Jackmon's placement in C Pod was purely a matter of happenstance and was not at the direction or prompting of the government. Further, once Jackmon was placed in C Pod, the government did not instruct Jackmon to strike up conversations with Lentz; at the outset, Lentz clearly volunteered information about the facts of his case and Jackmon began collecting this information on his own initiative. Indeed, AUSA Mellin and SA Garrett did not even know that Jackmon had been brought to the Eastern District of Virginia by AUSA Fahey. Nor was Jackmon ever offered any form of payment, whether in the form of monetary reward or a reduction in sentence, in exchange for collecting information about Lentz.[36]

49. While there is no dispute that Jackmon had an extensive history of government cooperation, there is no evidence that this cooperation "extended in any manner" to Jackmon's conversations with Lentz prior to December 30, 2004. *Love,* 134 F.3d at 604. While Jackmon testified that he certainly hopes his testimony in Lentz's case will lead to a motion for a downward departure, this is merely his

---

**34.** Payment need not be monetary; any substantial payment or reward for providing information might suffice, including remaining free on probation. *See Thomas,* 708 F.2d at 135 (citing *United States v. Sampol,* 636 F.2d 621, 638 (D.C.Cir.1980)).

**35.** It is worth noting that in large part, Lentz's motion to suppress fails with respect to statements made prior to December 30, 2004 because Lentz failed to prove the version of events he alleged in his brief. If Lentz had shown, as he contended in his brief, that AUSA Mellin intentionally had Jackmon transferred to NNRJ, knowing his history as a government informant, that he explicitly instructed Jackmon to get information from Lentz, and that AUSA Mellin told Jackmon he could forget his drug charges because Jackmon's testimony would result in a substantial reduction in his sentence, then Lentz would have established the requisite government

agency. Yet, Lentz failed to prove these allegations; the record reflects the contrary.

**36.** Lentz's argument that SA Garrett "paid" Jackmon for his cooperation by arranging three-way phone calls on Jackmon's behalf free of charge is unpersuasive. According to Major Hull's testimony, the value of such a call would amount to no more than $10.00. Accordingly, the total value of such calls would be at most $30.00. *See supra* note 19 (noting that SA Garrett testified that he arranged approximately three three-way calls for Jackmon). Such a picayune favor cannot constitute payment in exchange for information sufficient to establish an agency relationship. *Cf. United States v. Palmieri,* 623 F.Supp. 405, 406 n. 3 (discussing the arrangement between the government and a confidential informant pursuant to which the government paid the informant $13,000 for his cooperation).

expectancy or hope; he has never received any promises or assurances of this sort. Jackmon's hope that he would "curry an unpromised future favor with the government" is not sufficient to establish government agency, whether Jackmon is a former government cooperator or not. *See id.* (holding that defendant who had previously cooperated in a separate case was not a government agent where there was no evidence his cooperation extended to the matter under investigation); *United States v. Birbal,* 113 F.3d 342, 346 (2d Cir.1997) (same). To be sure, virtually every inmate in the federal system is certainly familiar with the operation of Rule 35 and is aware that providing information to the government in another case might lead to a reduction in his sentence. And the fact that a defendant has cooperated in the past puts the government under no greater obligation to "reward" an experienced cooperator for information than it does for someone who cooperates for the first time.[37] Thus, past involvement as a government informant or an agreement to cooperate in other contexts, by itself, does not establish government agency for all future cases. In other words, the fact of pact cooperation, even if extensive, does not operate to covert an informant into a government agent for all purposes. Instead, there must be some evidence that points persuasively to the conclusion that the informant's previous cooperation extends to this case—either some evidence of an "ongoing relationship,"[38] as in the case of a jailhouse informant paid on a contingent fee for information,[39] or some evidence of "prearrangement"[40] as evidenced by government instructions to get information from a particular defendant.[41] Accordingly, in this case, absent any evidence of an ongoing agreement to cooperate with the government (and there is none), and absent any intimation, suggestion, or direction from the government that it wanted Jackmon to obtain information from Lentz as Jackmon had done in other cases (and there is none prior to December 30), Jackmon's previous experience as an informant does not establish government agency for the purposes of this case.[42]

37. While Jackmon had an extensive history of government cooperation—providing information leading to as many as 18 convictions—this history of cooperation with the government, by itself, does not establish agency. *See* cases cited *supra* page 811.

38. *See Thomas,* 708 F.2d at 137.

39. *See Henry,* 447 U.S. at 270–71, 100 S.Ct. 2183 (stating that government agency established where informant paid on contingent-fee basis).

40. *See Thomas,* 708 F.2d at 137.

41. *See, e.g., Birbal,* 113 F.3d at 346 (An "informant becomes a government agent for the purposes [of establishing a Sixth Amendment violation] only when the informant has been instructed by the police to get information about the particular defendant.") (collecting cases); *United States v. Johnson,* 338 F.3d 918 (8th Cir.2003); *Moore v. United States,* 178 F.3d 994 (8th Cir.1999).

42. Nor is it sufficient to establish government agency, direction, or instigation that Jackmon's plea agreement included language that required him to be "honest and truthful" and to share any information he learned about criminal activity with the government. The Second Circuit in *Birbal* rejected the argument that an informant's plea agreement with the government requiring him "to provide any and all information in his possession relating directly or indirectly to any and all criminal activities" made him a government agent. *See Birbal,* 113 F.3d at 346. In this regard, the Second Circuit reasoned that the informant's agreement "did not make him a roving agent" with an ongoing cooperative relationship with the government and found it significant that the agreement did not specifically require him "to elicit information from [defendant] (or anyone else"). *Id.* In other words, agency is more likely established where "the informer's assigned (or assumed) mission is specifically targeted upon the accused." *Thomas,* 708 F.2d at 136 n. 6 (citing

50. In response, Lentz argues that Jackmon became a government agent after the December 2 and December 16, 2004 meetings with AUSA Mellin and SA Garrett because after those meetings, Jackmon began to operate under the direction of government "instructions" in conversations with a particular defendant, namely Lentz. Specifically, Lentz argues that the two instructions given to Jackmon at these meetings—that Jackmon should act only as a "listening post" and that Jackmon could personalize the conversations by talking about topics of mutual interest with Lentz—establish an agency relationship between the government and Jackmon.[43] Yet, the Fourth Circuit in *Thomas*, rejected the argument that "instructions" that merely define the ground rules for a "listening post," *i.e.* that do not direct the informant deliberately to elicit information, are sufficient to establish an agency relationship. *See Thomas*, 708 F.2d at 137. The Fourth Circuit found no agency created by a "simple admonition" to "keep your ears open" or to "listen but don't ask" questions, unless an express or implicit *quid pro quo* undergirds them. *Id.* To conclude otherwise, the Fourth Circuit reasoned, "would be in practical effect to establish the principle that any voluntary proffer of inmate informer assistance not met with silence or actually repudiated by state officials would make inadmissible any inculpatory disclosures arguably induced by the circumstances of confinement that are subsequently made by an accused in conversations with the inmate." *Id.* at 137. In this case, SA Garrett and AUSA Mellin merely instructed Jackmon on being a "listening post"—they told Jackmon to avoid any deliberate solicitation of information about Lentz's case, but highlighted that Jackmon certainly could still engage Lentz in conversation about topics of personal interest. *See Harker v. Maryland*, 800 F.2d 437, 444–45 (4th Cir.1986) (stating that an informant "instructed to overhear conversations and to engage a criminal defendant in some conversations would not necessarily be unconstitutional") (quoting *Henry*, 447 U.S. at 276, 100 S.Ct. 2183 (Powell, J., concurring)). Thus, while these "instructions" made Jackmon a better informed "listening post," they are not sufficient to establish agency. Thus, up until December 30, 2004, the record does not support a conclusion that Jackmon acted as a government agent in connection with his contacts with Lentz.

█ 51. This did not continue to be the case. In the course of Jackmon's December 30, 2004 phone call to SA Garrett, the relationship between Jackmon and the

---

*Henry*, 447 U.S. at 270–71 n. 8, 100 S.Ct. 2183).

**43.** Lentz's reliance on similarities between this case and the Supreme Court's decision in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), is misplaced. In *Henry*, the Supreme Court held that a paid FBI informant, "acting under instructions" not to initiate any conversations with defendant about his bank robbery charges, but to pay attention to any information he furnished, acted as a government agent when he ignored these instructions and deliberately elicited information from defendant. *Henry*, 447 U.S. at 270, 100 S.Ct. 2183. Significantly, the Supreme Court based its

finding of agency on far more than just these instructions. Indeed, central to the agency conclusion in *Henry* was that the informant there was paid on a "contingent-fee" basis demonstrating a formal "prearrangement" between the informant and the government, which also encouraged the informant to take an active rather than a passive role in eliciting inculpatory information. *See id.; Thomas*, 708 F.2d at 135 (declining to find an agency relationship where the inmate witness was a "self-initiated informant" not subject to the control of the government and had made no prior arrangement with the government to procure information from or testify against the accused).

government changed. During that call, Jackmon informed SA Garrett of Lentz's plot to kill two witnesses in his case and related the details of the plot.[44] Further, Jackmon explained to SA Garrett that in response to Lentz's inquiry, Jackmon had concocted a story about a contact of his who was willing to kill witnesses for a small fee. To facilitate this story, Jackmon suggested to SA Garrett that he send an FBI agent to the jail with a fake ID to play the role of a hit man in a conversation with Lentz. Significantly, at the end of the call, when Jackmon asked SA Garrett what additional information he wanted, SA Garrett responded, "Well you know, the key is as much detail as you can get." Indeed, he went on to suggest that in an attempt to obtain more detail from Lentz about the murder-for-hire plot that Lentz "could end up telling you [Jackmon] where he actually dumped her." These instructions, in contrast with the instructions given to Jackmon during the December 2 and December 16, 2004 debriefing sessions, did not simply caution Jackmon to be a "listening post." Instead, they were tantamount to asking Jackmon to elicit additional information from Lentz, including "as much detail" as Jackmon could obtain about the murder-for-hire plot and, if he could get it, the location of Doris Lentz's body. It is not persuasive to argue, as the government does, that these instructions were implicitly qualified by the unstated restriction that Jackmon should only gather "as much detail" as he could by passively waiting for Lentz to volunteer this information. Moreover, as a result of this December 30 telephone call and conversations that followed, SA Garrett put into motion Jackmon's proposed plan to send a government undercover agent, posing as a hit man, to speak with Lentz about the murder plot and to elicit further incriminating evidence. From this date forward, therefore, Jackmon's attempts to elicit information from Lentz may be fairly attributed to the government. See Thomas, 708 F.2d at 136 (stating that agency requires that the actions of an inmate informant be "fairly 'attributable to the Government'") (quoting Henry, 447 U.S. at 270, 100 S.Ct. 2183).

52. The government argues that even where the government instructs an informant to take active, deliberate steps to elicit information, no agency relationship with an informant arises unless there is an explicit or implicit quid pro quo. According to the government because it never offered to pay Jackmon or to move for a reduction in his sentence in exchange for his testimony, there can be no agency relationship. See Thomas, 708 F.2d at 137; Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 893 (3d Cir.1999) ("At a minimum ... there must be some evidence that an agreement, express or implied, between the individual and the government existed at the time the elicitation takes place.") (quoting Depree v. Thomas, 946 F.2d 784, 794 (11th Cir.1991)). Yet, this argument also fails for it is implicit in any request to an informant that he take active, deliberate steps to elicit information that any good information so elicited will lead to rewards for the informant. To conclude otherwise would permit the government to instruct informants, virtually all of whom are savvy enough to know that cooperation with the government can lead to a reduction in their sentences, to elicit information from a represented defendant without fear of having that evidence suppressed as long as the government never explicitly promises sentence reduction in exchange for the information. Indeed, it is

---

**44.** According to Jackmon, Lentz did not suggest he would also like to have one of the prosecutors in his case killed until January 1, 2005.

the government's routine practice not to make any promises of this sort prior to a witness's full cooperation. Thus, while instructions to act passively as a listening post are not sufficient to infer an implicit *quid pro quo* or to establish agency, an instruction to take active steps to elicit additional information necessarily implies a promised *quid pro quo* and establishes agency, especially when the informant follows those instructions and does so. Accordingly, it is proper to conclude that SA Garrett's instructions to Jackmon during the December 30, 2004 telephone conversations, and the government's attempt to carry out Jackmon's plan to use an undercover "hit man," are sufficient to "attribut[e] to the Government" all actions taken by Jackmon after December 30, 2004 to elicit information from Lentz. *Thomas,* 708 F.2d at 136 (quoting *Henry,* 447 U.S. at 270, 100 S.Ct. 2183). Therefore, if Jackmon deliberately elicited any statements from Lentz after December 30, 2004, those statements must be suppressed in this trial.

## B. Deliberate Solicitation of Information

■ 53. The analysis does not end here, however, because a Sixth Amendment violation is not established merely by showing that a government agent obtained incriminating information while acting as a "listening post" and reported that information to the police; rather, the defendant must also show that the informant "took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann,* 477 U.S. at 459, 106 S.Ct. 2616. The deliberate elicitation requirement recognizes that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Id.* Thus, the Supreme Court held in

*Kuhlmann* that the admission of a defendant's "spontaneous" and "unsolicited" statements when the informant "at no time asked any questions" did not violate the defendant's Sixth Amendment right to counsel. *Id.* at 440, 106 S.Ct. 2616. Yet, it is important to note that an informant can deliberately elicit information without ever asking any questions about a defendant's pending charges. He may do so through "indirect and surreptitious interrogation" of a defendant if it is the "functional equivalent of interrogation," by "stimulat[ing]" conversations with the defendant that are designed to "elicit" incriminating information. *See id.* at 458, 106 S.Ct. 2616 (quoting *Henry* 447 U.S. at 269–73, 100 S.Ct. 2183, and *Maine v. Moulton,* 474 U.S. 159, 177 n. 13, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)) (internal quotation marks omitted); *Moulton,* 474 U.S. at 165–66 n. 4, 177–78 n. 13 (stating that an informant accomplice engaged defendant in active conversation and elicited particular replies by repeatedly prompting defendant to remind him of details of crime and encouraging defendant to describe his plan for killing witnesses).

54. As noted *supra* in paragraphs 25 and 26–33, the evidence convincingly shows that Jackmon acted only as a listening post prior to December 16, and it is in equipoise on this issue for the period of December 16 through December 29, 2004. In any event, whether Jackmon deliberately elicited information during this period is ultimately immaterial to the analysis here because it is clear that Jackmon did not begin to act as a government agent until December 30, 2004. Thus, any information Jackmon deliberately elicited from Lentz prior to December 30, 2004 was not "attributable to the Government" and thus did not violate Lentz's Sixth Amendment rights. *Thomas,* 708 F.2d at 136 (quoting *Henry,* 447 U.S. at 270).

55. Yet, it is clear that Jackmon began to act as more than a mere listening post during the conversation on December 29, 2004 when Lentz began to reveal his murder-for-hire plot, and more importantly, that this deliberate elicitation continued after December 30, 2004 when Jackmon became a government agent. When Lentz approached Jackmon with his plan to kill witnesses in his case, Jackmon did not simply listen to the plan; instead, he became an active participant, offering additional information and assistance in carrying out Lentz's plot. More specifically, (i) Jackmon told Lentz he could have prosecution witnesses killed for only a fraction of the amount Lentz had estimated, (ii) Jackmon offered to introduce Lentz to a "hit man" who could carry out the plan, and (iii) Jackmon led Lentz to believe that he was willing to act as an accomplice in Lentz's murder-for-hire plot. In the days that followed, Jackmon repeated his promise to arrange a meeting with "Mike" and he agreed to participate in the plot after his release from jail by using code to relay information to the hit man. Thus, Jackmon's active participation in the plot, though feigned, served to prompt Lentz to make additional statements that would incriminate Lentz in his murder-for-hire plot and, in turn, also in his kidnapping for murder prosecution. *See supra* n. 1 and pp. 808 – 809.

56. Although it appears that Jackmon elicited some of this information by asking direct questions of Lentz, the finding of deliberate solicitation of information after December 29, 2004 is not dependent on whether Jackmon elicited this information directly through the use of interrogatories or by "indirect and surreptitious [interrogation]." *See Henry*, 447 U.S. at 273, 100 S.Ct. 2183. In other words, by stimulating conversations with Lentz that were designed to "elicit" incriminating information, Jackmon engaged in the "functional equivalent of interrogation." *Kuhlmann*, 477 U.S. at 458, 106 S.Ct. 2616 (quoting *Henry*, 447 U.S. at 273, 277, 100 S.Ct. 2183).

57. In sum, all of Lentz's statements to Jackmon on and after December 29, 2004 were the product of deliberate solicitation by Jackmon. Yet, because Jackmon did not become a government agent until December 30, 2004, it is only statements after that date that must be suppressed. Lentz's statements made prior to December 30, 2004, including the statements in the course of the December 29, 2004 murder-for-hire conversation are admissible as they were elicited, even if deliberately, prior to the establishment of government agency. *See supra* ¶ 54.

## C. Attachment of Right to Counsel

58. The government argues that even if at some point Jackmon, as a government agent, deliberately elicited evidence of the murder-for-hire plot from Lentz, this evidence is admissible in this case because the Sixth Amendment right to counsel does not attach to these uncharged crimes. It is clear, of course, that "[t]he Sixth Amendment right to counsel prohibits the government from deliberately eliciting incriminating evidence from an accused 'after he has been indicted and in the absence of counsel.'" *United States v. Kidd*, 12 F.3d 30, 32 (4th Cir.1993) (quoting *Massiah*, 377 U.S. at 206, 84 S.Ct. 1199). Importantly, it is equally clear that this right is "offense-specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced . . . ." *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). Thus, the Supreme Court has recognized that the Sixth Amendment does not insulate an indicted defendant from "government investigations of new criminal activity for which an

accused has not been indicted." *Kidd,* 12 F.3d at 32 (citing *McNeil,* 501 U.S. at 175–176, 111 S.Ct. 2204).[45]

59. It is true that Lentz has not been indicted for plotting to murder witnesses or prosecutors in his case and so his Sixth Amendment right to counsel was limited in January 2005 to the kidnapping for murder charges. Thus, it is clear that deliberate solicitation of evidence about the plot was entirely proper and indeed necessary to thwart any attempt to kill government witnesses or prosecutors. It is also clear that the Sixth Amendment would not bar the admissibility of any statements deliberately elicited by Jackmon from Lentz about the murder-for-hire plot in a separate prosecution for that crime. *See Moulton,* 474 U.S. at 180 n. 16, 106 S.Ct. 477 ("Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses.").[46]

60. Yet, the same result does not obtain with respect to this prosecution given that the kidnapping for murder charges *were* pending at the time Jackmon spoke with Lentz. While there is no published decision directly on point, the Supreme Court's rationale in *Moulton* points persuasively to the conclusion that where, as here, a government agent deliberately elicits statements regarding an unindicted charge, those statements, while admissible at the trial for the unindicted charge, are *not* admissible at a trial for a charge that was pending at the time the statements were solicited. In *Moulton,* the Supreme Court upheld the suppression of incriminating statements defendant unwittingly made to a "wired" accomplice pertaining to pending charges. Notwithstanding the fact that police also claimed to have had other legitimate reasons for listening to the conversations, namely investigating a related plan to kill prosecution witnesses and protecting the informant's safety. *See Moulton,* 474 U.S. at 178–79, 106 S.Ct. 477. The Supreme Court affirmed the state's legitimate interest in investigating the other crimes, but held that:

> [I]ncriminating statements pertaining to pending charges are inadmissible at the trial of those charges, notwithstanding the fact that the police were also investigating other crimes, if, in obtaining this evidence, the State violated the Sixth Amendment by knowingly circumventing the accused's right to the assistance of counsel.

*Id.* at 180, 106 S.Ct. 477. To be sure, the facts in *Moulton* differ somewhat from the facts presented here. There, the state sought to admit evidence pertaining to the *pending charges.* In contrast, in this case, the government seeks to admit evidence of statements pertaining to the *unindicted* crime as consciousness of guilt in the currently-pending prosecution. *See, e.g.,*

---

45. *See also Maine v. Moulton,* 474 U.S. 159, 180, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ("[T]o exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."). Where, as here, the government is investigating a plot to murder witnesses, "such a holding would be tantamount to declaring 'open season' on government witnesses." *United*

States v. Terzado–Madruga, 897 F.2d 1099, 1112 (11th Cir.1990).

46. Of course, while there is no evidence of bad faith, in this case, where the government merely constructs a "murder" theory as a pretext for obtaining incriminating statements regarding the pending charges, these statements may also be subject to suppression in a subsequent murder trial. *See Terzado–Madruga,* 897 F.2d at 1111 (citing *United States v. Nocella,* 849 F.2d 33 (1st Cir.1988)).

*United States v. Van Metre,* 150 F.3d 339, 352 (4th Cir.1998) (holding that evidence of solicitation to kill witnesses is admissible as consciousness of guilt evidence). Nonetheless, the Supreme Court's rationale in *Moulton* applies with equal force here and precludes the use of the post-December 29 statements in this prosecution. As the Supreme Court in *Moulton* put it:

> To allow the admission of evidence obtained from the accused in violation of his Sixth Amendment rights whenever the police assert an alternative, legitimate reason for their surveillance invites abuse by law enforcement personnel in the form of fabricated investigations and risks the evisceration of the Sixth Amendment right recognized in *Massiah. Id.* at 180, 106 S.Ct. 477.

In the same way here, the Sixth Amendment right elucidated in *Massiah* would be eviscerated if statements deliberately elicited by a government agent with respect to an unindicted crime could be used as consciousness of guilt evidence in connection with an indicted pending charge.[47]

62. Thus, in this case, despite the fact that the government may use the evidence of the murder-for-hire plot deliberately elicited from Lentz after December 30, 2004 in a subsequent trial for solicitation of murder, it may not use that evidence in this trial.

## V.

In sum, therefore, the record evidence does not establish that for any period prior to December 16, 2004 that Jackmon acted as anything more than a listening post. From December 16, 2004 until December 29, 2004, the evidence is in equipoise in this regard and the defendant has not met his burden of establishing that Jackmon actively sought or deliberately elicited information from Lentz during this period. After December 29, however, the record reflects that Jackmon deliberately elicited information from Lentz. With respect to agency, the record reflects that Jackmon was not a government agent at any time prior to December 30, but that he acted as a government agent thereafter. Thus, Jackmon was both a government agent and more than a listening post after December 30. Accordingly, the motion to suppress must be granted in part and denied in part. It must be denied as to all information obtained by Jackmon from Lentz prior to December 30, and it must be granted as to all statements and information obtained by Jackmon after December 30, as admission of these statements would constitute a violation of Lentz's Sixth Amendment right to counsel.[48]

An appropriate Order will issue.

---

47. The government's reliance on *Kidd* to reach the opposite conclusion is misplaced; that case is easily distinguished. There, the Fourth Circuit held only that evidence of a post-indictment drug transaction, even though deliberately elicited by the government, could be considered as relevant conduct at sentencing. Significantly, the Fourth Circuit explicitly emphasized that its "holding does not imply" that use of the evidence at a trial on the offenses for which defendant earlier had been charged would be permissible. *See Kidd,* 12 F.3d at 33 n. 2 (citing *Moulton,* 474 U.S. at 180, 106 S.Ct. 477).

48. In light of the result reached here, it is necessary to address the effect of Mr. Salvato's conflict of interest should the government to call Jackmon to testify at the retrial. Should this occur, then for the reasons stated earlier, *see supra* note 7, including preservation of the integrity of the judicial process, Mr. Cummings will remain appointed to rep-

resent Lentz for the limited purpose of cross-examining Jackmon. *See U.S. v. Williams,* 81 F.3d at 1324. (stating that the decision of whether to permit an auxiliary lawyer to cross-examine a witness who creates a potential conflict of interest for lead counsel is within the discretion of the district court). Mr. Salvato may continue to represent Lentz in all other respects of the retrial, together with Ms. Austin, provided Lentz, after a thorough *voir dire*, knowingly and voluntarily waives his right to conflict-free counsel. *See id.* (describing the process by which a criminal defendant can waive his right to conflict-free counsel).